| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| PAUL LAURIN, Bar No. 136287<br>paul.laurin@btlaw.com<br>JONATHAN J. BOUSTANI, Bar No. 274748<br>jonathan.boustani@btlaw.com<br>BARNES & THORNBURG LLP<br>2029 Century Park East, Suite 300<br>Los Angeles, California 90067<br>Telephone: (310) 284-3880<br>Facsimile: (310) 284-3894 | |

☐ *Individual appearing without attorney*
☒ *Attorney for:* Wonderdog 1 Productions, Inc.

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br>CINEMA MANAGEMENT GROUP, LLC | CASE NO.: 2:24-bk-20369-NB |
|---|---|
| | CHAPTER: 7 |
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (PERSONAL PROPERTY)** |
| Debtor(s). | DATE: 02/11/2025<br>TIME: 10:00<br>COURTROOM: 1545 |

**Movant:** Wonderdog 1 Productions, Inc.

1. **Hearing Location**:

   ☒ 255 East Temple Street, Los Angeles, CA 90012    ☐ 411 West Fourth Street, Santa Ana, CA 92701
   ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367    ☐ 1415 State Street, Santa Barbara, CA 93101
   ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (if any)(Responding Parties), their attorneys (if any), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay, as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                    Page 1                    **F 4001-1.RFS.PP.MOTION**

4.  When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5.  If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6.  ☒ This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d).  If you wish to oppose this motion, you must file a written response to this motion with the court and serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above no less than 14 days before the hearing and appear at the hearing of this motion.

7.  ☐ This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b).  If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

    a.  ☐ An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

    b.  ☐ An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

    c.  ☐ An application for order setting hearing on shortened notice and remains pending.  After the court has ruled on that application, you will be served with another notice or an order that will specify the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date:  _01/17/2025_

Barnes & Thornburg LLP
_____
Printed name of law firm (if applicable)

Paul J. Laurin
_____
Printed name of individual Movant or attorney for Movant


/s/ Paul J. Laurin
_____
Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 2                          F 4001-1.RFS.PP.MOTION

# MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO PERSONAL PROPERTY

1. Movant has a perfected security interest in the Property.    (N/A. Movant owns the rights.)

2. **The Property at Issue (Property):**

   a. ☐ Vehicle (*year, manufacturer, type, and model*):

      *Vehicle Identification Number:*
      *Location of vehicle (if known):*

   b. ☐ Equipment (*manufacturer, type, and characteristics*):

      *Serial number(s):*

      *Location (if known):*

   c. ☒ Other Personal Property (*type, identifying information, and location*):
      Contract rights under Sales Agency Agreement dated September 30, 2023 between
      Debtor and Wonderdog 1 Productions, Inc.

3. **Bankruptcy Case History:**

   a. ☒ A voluntary bankruptcy petition  ☐ An involuntary bankruptcy petition
      under chapter  ☒ 7  ☐ 11  ☐ 12  ☐ 13  was filed on (*date*)  12/20/2024  .

   b. ☐ An order to convert this case to chapter  ☐ 7  ☐ 11  ☐ 12  ☐ 13  was entered on (*date*) _____.

   c. ☐ Plan was confirmed on (*date*) _____.

4. **Grounds for Relief from Stay:**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant the requested relief from stay as follows:

      (1) ☒ Movant's interest in the Property is not adequately protected.

         (A) ☒ Movant's interest in the Property is not protected by an adequate equity cushion.

         (B) ☐ The fair market value of the Property is declining and payments are not being made to Movant
            sufficient to protect Movant's interest against that decline.

         (C) ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's
            obligation to insure the collateral under the terms of Movant's contract with Debtor.

         (D) ☒ Other (*see attached continuation page*).    Debtor is unable to perform its contractual obligations and realize
                                                            value for the estate.

      (2) ☐ The bankruptcy case was filed in bad faith.

         (A) ☐ Movant is the only creditor, or one of very few creditors, listed or scheduled in the Debtor's case
            commencement documents.

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 3                              F 4001-1.RFS.PP.MOTION

(B) ☐ The Property was transferred to the Debtor either just before the bankruptcy filing or after the filing.

(C) ☐ A non-individual entity was created just prior to the bankruptcy petition date for the sole purpose of filing this bankruptcy case.

(D) ☐ Other bankruptcy cases were filed in which an interest in the Property was asserted.

(E) ☐ The Debtor filed only a few case commencement documents with the bankruptcy petition. Schedules and statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

(3) ☐ *(Chapter 12 or 13 cases only)* All payments on account of the Property are being made through the plan and plan payments have not been made to the chapter 12 or chapter 13 trustee for payments due
☐ postpetition preconfirmation ☐ postpetition postconfirmation.

(4) ☐ The lease has matured, been rejected or deemed rejected by operation of law.

(5) ☐ The Debtor filed a statement of intention that indicates the Debtor intends to surrender the Property.

(6) ☐ Movant regained possession of the Property on *(date)* _____, which is
☐ prepetition ☐ postpetition.

(7) ☐ For other cause for relief from stay, see attached continuation page.

b. ☐ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and, pursuant to 11 U.S.C. § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

5. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor.

a. ☐ These actions were taken before Movant knew that the bankruptcy petition had been filed and Movant would have been entitled to relief from stay to proceed with those actions,

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions,

c. ☐ Other *(specify)*:

6. ☒ **Evidence in Support of Motion:** *(Declaration(s) must be signed under penalty of perjury and attached to this motion)*

a. The PERSONAL PROPERTY DECLARATION on page 6 of this motion.

b. ☒ Supplemental declaration(s).

c. ☐ The statements made by the Debtor under penalty of perjury concerning Movant's claims and the Property as set forth in the Debtor's case commencement documents. Authenticated copies of the relevant portions of the case commencement documents are attached as Exhibit(s) _____.

d. ☐ Other:

7. **An optional Memorandum of Points and Authorities is attached to this motion.    See Exhibit B hereto.**

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 4                                    F 4001-1.RFS.PP.MOTION

**Movant requests the following relief:**

1. Relief from the stay is granted under: ☒ 11 U.S.C. § 362(d)(1)  ☒ 11 U.S.C. § 362(d)(2)

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to repossess and sell the Property.

3. ☐ Confirmation that there is no stay in effect.

4. ☐ The stay is annulled retroactive to the petition date.  Any postpetition actions taken by Movant to enforce its remedies regarding the Property do not constitute a violation of the stay.

5. ☐ The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6. ☐ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7. ☐ The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

8. ☐ The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

9. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days, so that no further stay shall arise in that case as to the Property.

10. ☐ The order is binding and effective in any future bankruptcy case, no matter who the debtor may be
    ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

11. ☒ If relief from stay is not granted, the court orders adequate protection.

12. ☐ See continuation page for other relief requested

Date:  01/17/2025

Barnes & Thornburg LLP
_____
Print name of law firm

Paul J. Laurin
_____
Print name of individual Movant or attorney for Movant

/s/ Paul J. Laurin
_____
Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                           Page 5                          F 4001-1.RFS.PP.MOTION

# PERSONAL PROPERTY DECLARATION

I, (*name of declarant*) Shea Wageman_____, declare:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the Property (*specify*):

   a. ☐ I am the Movant.

   b. ☒ I am employed by Movant as (*title and capacity*): President

   c. ☐ Other (*specify*):

2. a. ☐ I am one of the custodians of the books, records and files of Movant that pertain to loans, leases, or extensions of credit given to Debtor concerning the Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

   b. ☒ Other (see attached):
   I am the custodian with personal knowledge of the Sales Agency Agreement dated September 30, 2023 attached as Exhibit 1 to my separately filed declaration in support of the instant Motion.

3. The Property is:

   a. ☐ Vehicle (*year, manufacturer, type, model and year*):

   Vehicle Identification Number:
   Location of vehicle (*if known*):

   b. ☐ Equipment (*manufacturer, type, and characteristics*):

   Serial number(s):
   Location (*if known*):

   c. ☒ Other personal property (*type, identifying information, and location*):
   Contract rights under Sales Agency Agreement dated September 30, 2023 between Debtor and Wonderdog 1 Productions, Inc.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 6                                    F 4001-1.RFS.PP.MOTION

4.  The nature of Debtor's interest in the Property is:

    a.  ☒  Sole owner

    b.  ☐  Co-owner (*specify*):

    c.  ☐  Lessee

    d.  ☐  Other (*specify*):

    e.  ☐  Debtor  ☐ did  ☐ did not   list the Property in the schedules filed in this case.

5.  ☐  The lease matured or was rejected on (*date*) _____:

    a.  ☐  rejected

      (1)  ☐  by operation of law.

      (2)  ☐  by order of the court.

    b.  ☐  matured.

6.  Movant has a perfected security interest in the Property.   (*N/A. Movant owns the rights.*)

    a.  ☐  A true and correct copy of the promissory note or other document that evidences the debt owed by the Debtor to Movant is attached as Exhibit _____.

    b.  ☐  The Property is a motor vehicle, boat, or other personal property for which a certificate of title is provided for by state law.  True and correct copies of the following items are attached to this motion:

      (1)  ☐  Certificate of title ("pink slip") (Exhibit _____).

      (2)  ☐  Vehicle or other lease agreement (Exhibit _____).

      (3)  ☐  Security agreement (Exhibit _____).

      (4)  ☐  Other evidence of a security interest (Exhibit _____).

    c.  ☒  The Property is equipment, intangibles, or other personal property for which a certificate of title is not provided for by state law.  True and correct copies of the following items are attached to this motion:

      (1)  ☐  Security agreement (Exhibit _____).

      (2)  ☐  UCC-1 financing statement (Exhibit _____).

      (3)  ☐  UCC financing statement search results (Exhibit _____).

      (4)  ☐  Recorded or filed leases (Exhibit _____).

      (5)  ☐  Other evidence of perfection of a security interest (Exhibit _____).

    d.  ☐  The Property is consumer goods.  True and correct copies of the following items are attached to this motion:

      (1)  ☐  Credit application (Exhibit _____).

      (2)  ☐  Purchase agreement (Exhibit _____).

      (3)  ☐  Account statement showing payments made and balance due (Exhibit _____).

      (4)  ☐  Other evidence of perfection of a security interest (*if necessary under state law*) (Exhibit _____).

    e.  ☐  Other liens against the Property are attached as Exhibit _____.

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                         Page 7                              **F 4001-1.RFS.PP.MOTION**

7. Status of Movant's debt:

    a.   The amount of the monthly payment: $ _____.

    b.   Number of payments that became due and were not tendered: ☐ prepetition ☐ postpetition.

    c.   Total amount in arrears: $ _____.

    d.   Last payment received on (*date*): _____.

    e.   Future payments due by the anticipated hearing date (*if applicable*): _____
       An additional payment of $ _500000_____ will come due on (*date*) _06/01/2025_, and on
       the _____ day of each month thereafter. If the payment is not received by the _____
       day of the month, a late charge of $ _____ will be charged under the terms of the loan.

8. ☐   Attached as Exhibit _____ is a true and correct copy of a POSTPETITION payment history that accurately
    reflects the dates and amounts of all payments made by the Debtor since the petition date.

9. Amount of Movant's debt:

    a.   Principal:.................................................................................................... $ _1500000_____
    b.   Accrued interest: ....................................................................................... $ _____
    c.   Costs (attorney's fees, late charges, other costs):..................................... $ _____
    d.   Advances (property taxes, insurance): ....................................................... $ _____
    e.   TOTAL CLAIM as of _____:............................................................. $ _____

10. ☒   (*Chapter 7 and 11 cases only*) Valuation: The fair market value of the Property is: $ _0_____.
    This valuation is based upon the following supporting evidence:

    a. ☐   This is the value stated for property of this year, make, model, and general features in the reference guide
        most commonly used source for valuation data used by Movant in the ordinary course of its business for
        determining the value of this type of property. True and correct copies of the relevant excerpts of the most
        recent edition of the reference guide are attached as Exhibit _____.

    b. ☐   This is the value determined by an appraisal or other expert evaluation. True and correct copies of the
        expert's report and/or declaration are attached as Exhibit _____.

    c. ☒   The Debtor's admissions in the Debtor's schedules filed in the case. True and correct copies of the relevant
        portions of the Debtor's schedules are attached as Exhibit _A_____.

    d. ☒   Other basis for valuation (*specify*):
        contract for unique personal services

---

**NOTE:** If valuation is contested, supplemental declarations providing additional foundation for the
        opinions of value should be submitted.

---

11. Calculation of equity in Property:

    a. ☒   **11 U.S.C. § 362(d)(1) - Equity Cushion:**

        I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s)
        senior to Movant's debt is $ _0_____ and is _0_____% of the fair market value of the
        Property.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                          Page 8                           F 4001-1.RFS.PP.MOTION

b.  ☒ **11 U.S.C. § 362(d)(2)(A) - Equity**:

By subtracting the total amount of all liens on the Property from the value of the Property as set forth in Paragraph 10 above, I calculate that the Debtor's equity in the Property is $ -1500000 _____.
and resulting indemnified damages

12. ☒  The fair market value of the Property is declining because:
The contract rights cvannot be fully exploited due to Debtor's bankruptcy.

13. ☐  The Debtor's intent is to surrender the Property.  A true and correct copy of the Debtor's statement of intentions is attached as Exhibit _____.

14. ☐  Movant regained possession of the Property on (date) _____, which is:  ☐ prepetition.  ☐ postpetition.

15. ☐  (Chapter 12 or 13 cases only) Status of Movant's debt and other bankruptcy case information:

a.  The 341(a) meeting of creditors is currently scheduled for (or concluded on) (date) _____
A plan confirmation hearing is currently scheduled for (or concluded on) (date) _____
The plan was confirmed on (if applicable) (date) _____

b.  Postpetition preconfirmation payments due BUT REMAINING UNPAID after the filing of the case:

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

(See attachment for additional breakdown of information attached as Exhibit _____.)

c.  Postconfirmation payments due BUT REMAINING UNPAID after the plan confirmation date (if applicable):

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

d.  Postpetition advances or other charges due but unpaid:                    $
(For details of type and amount, see Exhibit _____)

e.  Attorneys' fees and costs:                                              $
(For details of type and amount, see Exhibit _____)

f.  Less suspense account or partial paid balance:                          $ [                    ]

TOTAL POSTPETITION DELINQUENCY:          $

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

g. ☐ The entire claim is provided for in the chapter 12 or 13 plan and postpetition plan payments are delinquent. The plan payment history is attached as Exhibit _____. See attached declaration(s) of chapter 12 trustee or 13 trustee regarding receipt of payments under the plan (*attach LBR form F 4001-1.DEC.AGENT.TRUSTEE*).

16. ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with Debtor.

17. ☐ The bankruptcy case was filed in bad faith:

a. ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

b. ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

c. ☐ The Debtor filed only a few case commencement documents. Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

d. ☐ Other (*specify*):


18. ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

a. ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page for facts establishing the scheme.

b. ☐ Multiple bankruptcy cases affecting the Property:

(1) Case name: _____
Chapter: _____      Case number: _____
Date filed: _____      Date discharged: _____      Date dismissed: _____
Relief from stay regarding the Property ☐ was ☐ was not  granted.

(2) Case name: _____
Chapter: _____      Case number: _____
Date filed: _____      Date discharged: _____      Date dismissed: _____
Relief from stay regarding the Property ☐ was ☐ was not  granted.

(3) Case name: _____
Chapter: _____      Case number: _____
Date filed: _____      Date discharged: _____      Date dismissed: _____
Relief from stay regarding the Property ☐ was ☐ was not  granted.

☐ See attached continuation page for more information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, and defraud creditors.

19. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

a. ☐ These actions were taken before Movant knew the bankruptcy case had been filed, and Movant would have been entitled to relief from stay to proceed with these actions.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 10                              F 4001-1.RFS.PP.MOTION

b. ☐ Although Movant knew the bankruptcy case was filed, Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 01/17/2025 | Shea Wageman | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                                Page 11                                        F 4001-1.RFS.PP.MOTION

# EXHIBIT A

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
</table>

Debtor name    **Cinema Management Group, LLC**

United States Bankruptcy Court for the:    CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)    _____

☐ Check if this is an
amended filing

## Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1:    Cash and cash equivalents**

1. **Does the debtor have any cash or cash equivalents?**

☐ No.  Go to Part 2.
☒ Yes Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | | | Current value of debtor's interest |
|---|---|---|---|

3.    **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | **Bank of California** | **Checking** | **6250** | **$61,044.76** |
| 3.2. | **Bank of California -   This account holds funds for ten films of various producers. Debtor claims no interest in these funds.** | **Savings** | **3014** | **$40,993.07** |
| 3.3. | **Banc of California - these funds are for the benefit of the producer of the production known as Charlie the Wonderdo; Debtor claims no interest in these funds.** | **Savings** | **5887** | **$414,100.00** |
| 3.4. | **Banc of California - These funds are held for the benefit of the producers of the production known as Buffalo Kids. Debtor claims no interest in these funds.** | **Savings** | **4164** | **$637,918.00** |
| 3.5. | **Banc of California - This aare held for the benefit of the producers of the production known as Panda Bear in Africa.Debtor claims no interest in these funds.** | **Savings** | **1748** | **$88,832.57** |

Software Copyright (c) 1996-2024 Best Case, LLC - www.bestcase.com                    Best Case Bankruptcy

| Debtor | **Cinema Management Group, LLC** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| 3.54 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$1,550.00** |
|---|---|---|---|
| | **The Institution**<br>**475 Cold Canyon**<br>**Calabasas, CA 91302** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  01/01/2007 | Basis for the claim:  Sales Agency Agreement | |
| | Last 4 digits of account number  _ | Is the claim subject to offset?  ☒ No   ☐ Yes | |

| 3.55 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$72,884.47** |
|---|---|---|---|
| | **The Perfect Host, LLC**<br>**2932 Wilshire Boulevard - Suite 201**<br>**Santa Monica, CA 90403** | ☐ Contingent<br>☐ Unliquidated<br>☒ Disputed | |
| | Date(s) debt was incurred  02/08/2010 | Basis for the claim:  Sales Agency Agreement | |
| | Last 4 digits of account number  _ | Is the claim subject to offset?  ☒ No   ☐ Yes | |

| 3.56 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$1,500,000.00** |
|---|---|---|---|
| | **Wonderdog 1 Productions, Inc.**<br>**341 Water Street - Suite 200**<br>**Vancouver, British Columbia V6B1B8** | ☒ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  09/30/2023 | Basis for the claim:  Sales Agency Agreement | |
| | Last 4 digits of account number  _ | Is the claim subject to offset?  ☒ No   ☐ Yes | |

| 3.57 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$1,403.66** |
|---|---|---|---|
| | **WW Entertainment BV**<br>**Meeuwenlaan 100**<br>**1021JL Amsterdam**<br>**Netherlands** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  12/14/2022 | Basis for the claim:  Sales Agency Agreement | |
| | Last 4 digits of account number  _ | Is the claim subject to offset?  ☒ No   ☐ Yes | |

| 3.58 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$33,293.27** |
|---|---|---|---|
| | **Zambezi Film Pty Ltd**<br>**The Long House**<br>**Dreyesdal Farm**<br>**Bergvliet, Cape Town, South Africa** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  08/15/2008 | Basis for the claim:  Sales Agency Agreement | |
| | Last 4 digits of account number  _ | Is the claim subject to offset?  ☒ No   ☐ Yes | |

---

**Part 3:**    **List Others to Be Notified About Unsecured Claims**

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| | | |

**Part 4:**    **Total Amounts of the Priority and Nonpriority Unsecured Claims**

5.   Add the amounts of priority and nonpriority unsecured claims.

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. | $    0.00 |
| 5b. Total claims from Part 2 | 5b.  + | $    7,356,501.82 |
| 5c. Total of Parts 1 and 2<br>    Lines 5a + 5b = 5c. | 5c. | $    7,356,501.82 |

# EXHIBIT B

PAUL LAURIN, Bar No. 136287
*paul.laurin@btlaw.com*
JONATHAN J. BOUSTANI, Bar No. 274748
*jonathan.boustani@btlaw.com*
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California  90067
Telephone:    (310) 284-3880
Facsimile:    (310) 284-3894

Attorneys for Wonderdog 1 Productions, Inc.

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.  2:24-bk-20369-NB |
| CINEMA MANAGEMENT GROUP, LLC, | Chapter Number:  7 |
| Debtor. | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (d)(1) and (2) WITH RESPECT TO SALES AGENCY AGREEMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF SHEA WAGEMAN IN SUPPORT THEREOF** |
| | **[BANKRUPTCY OFFICIAL FORM 4001-1. RFS.PP.MOTION FILED CONCURRENTLY]** |
| | Hearing: |
| | Date:  February 11, 2025<br>Time: 10:00 a.m.<br>Place:  Edward R. Roybal Building and Courthouse, 255 E. Temple Street, Courtroom 1545, Los Angeles, CA 90012 |

TO THE HONORABLE NEIL W. BASON, THE OFFICE OF THE U.S. TRUSTEE,

THE 20 LARGEST CREDITORS, ALL PARTIES IN INTEREST, AND ALL ATTORNEYS

OF RECORD:

Barnes &
Thornburg LLP
Attorneys At Law
Los Angeles

1        **PLEASE TAKE NOTICE THAT** Wonderdog 1 Productions, Inc. ("Wonderdog"), a

2    creditor with an undisputed claim against Cinema Management Group, LLC ("Debtor" or "CMG"),

3    pursuant to 11 U.S.C. 362 (d)(1) and (2), Bankruptcy Rules 4001, 6006, and 9013-1(d) of the

4    Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 4001-1 ("LBR"), will and

5    hereby does move the Court (the "Motion") for issuance of an Order granting relief from the

6    automatic stay to allow for (1) termination of an executory sales agency agreement between

7    Wonderdog and Debtor under applicable non-bankruptcy law, and (2) employment of all necessary

8    non-bankruptcy law remedies in accordance with applicable non-bankruptcy law in mitigation of

9    losses resulting from Debtor's uncurable breach and subject to conditions for the benefit of the

10    estate, or alternatively for adequate protection pursuant to 11 U.S.C. §§363 (d)(1). The hearing on

11    the motion will be held before the Hon. Neil W. Bason on February 11, 2025 at 10:00 a.m. at the

12    United States Bankruptcy Court, Central District of California, Edward R. Roybal Building and

13    Courthouse, 255 E. Temple Street, Courtroom 1545, Los Angeles, CA 90012.

14        **PLEASE TAKE FURTHER NOTICE** that parties in interest may appear at and

15    participate in the hearing on the Motion by ZoomGov video and audio using a personal computer

16    (equipped with camera, microphone and speaker), or a handheld mobile device (such as an iPhone

17    or Android phone), free of charge. Individuals may opt to participate by audio only using a

18    telephone (standard telephone charges may apply). Instructions on how to appear via ZoomGov

19    and telephone are available under the "Phone/Video Appearances" section of the Court's website

20    at https://www.cacb.uscourts.gov/judges/honorable-neil-w-bason .

21        This Motion is based on (1) the Notice of Hearing (2) the Memorandum of Points and

22    Authorities; (3) the Declaration of Shea Wageman; (4) all pleadings, papers and records on file

23    herein; and (7) any oral argument presented at the hearing on this Motion.

24        Pursuant to Local Rule 9013-1(f) a written response or objection must be filed and served

25    at least 14 days before the hearing.  The failure to file and serve a timely opposition to the Motion

26    may be deemed by the Court to constitute consent to the relief requested in the Motion.

27        **WHEREFORE**, Wonderdog respectfully requests that the Court grant the Motion and such

28    other and further relief as it deems necessary, just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BARNES & THORNBURG LLP**

Dated:  January 17, 2025

By  /s/ Paul J. Laurin

Paul J. Laurin
Jonanthan Boustani
Attorneys for Wonderdog 1 Productions, Inc.

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to 11 U.S.C. §362(d)(1) and (2), Wonderdog 1 Productions Inc. ("Wonderdog") a contract counterparty and creditor of Cinema Management Group, LLC ("Debtor") respectfully moves the Court for relief from the automatic stay to effect non-bankruptcy remedies in mitigation of  losses suffered due to a non-curable material breach of its contract with Debtor, or, for alternative provision of adequate protection.

## I.

## FACTUAL BACKGROUND

1.      On September 30, 2023, the Debtor entered into a sales agency agreement (the "Sales Agency Agreement") with Wonderdog whereby Debtor undertook to be the foreign sales agent for the film with the working title "Charlie the Wonderdog", an independent feature animated motion picture (the "Picture"). Pursuant to the SAA, Debtor undertook to represent Wonderdog in the distribution of the Picture in international markets other than the United States and Canada as a sales agent and master distributor. Wonderdog is the producer of the Picture and owns the copyright and all ancillary rights to exploitation of the Picture.  Wonderdog is an affiliate through common ownership with Icon Creative Studio, Inc. ("Icon"), a leading Canadian computer graphics animation production company.  The Debtor's only rights in the Picture are pursuant to the SAA as the Sales Agent with distribution rights. The SAA is presently in effect and executory. It became binding upon the occurrence of two conditions precedent: (1) exchange of a fully executed agreement; and (2) delivery to Debtor of a mortgage of Copyright and Security Interest in the from attached to the SAA. (Wageman Decl. ¶ 3, Ex. 1 at p. 1)

2.      The SAA imposes numerous critical obligations on Debtor during the production of the Picture with the objective of maximizing distribution and related licensing revenue across the globe. The production of the Picture is ongoing with a final Complete Delivery Date of June 1, 2025.[1]

3.      Pursuant to the SAA, Debtor was appointed the non-exclusive agent of

---

[1] Defined terms have the meaning set forth in the SAA attached as Exhibit "1" to the Declaration of Shea Wageman ("Wageman Declaration").

Wonderdog for 20 years and received a license in the Picture to sublicense to foreign distributors for a 5-year term. In exchange, Debtor agreed to pay Wonderdog $1.5 million as a minimum guaranty payment (the "Minimum Guaranty"), which would be a fully earned, non-returnable fee. Such payment is  scheduled to be made in three $500,000 installments commencing on the Complete Delivery of the Picture (scheduled for June 1, 2025) and thereafter 3 and 6 months after that date. Once receipts from the international distribution of the Picture recoup contractually authorized charges and sales commissions, then Debtor may recoup on a *pari passu* basis with Wonderdog that amount of the Minimum Guaranty and thereafter share in the profits of international distribution with Wonderdog.  The Minimum Guaranty has not bee paid but will come due upon Complete Delivery.

4.      Consistent with industry custom and practice, Wonderdog pledged the Minimum Guaranty to the National Bank of Canada ("NBC") to secure a production credit facility.

5.      In the period since the execution of the SAA and prior to the filing of this bankruptcy case, Debtor has presold and obtained deposit-secured commitments from international distributors for the distribution rights. Wonderdog is informed and believes that a total of 22 international distribution agreements have been entered into by Debtor peraining to the Picture. (Wageman Decl. ¶ 8)

6.      Debtor's bankruptcy schedules reflect that it has collected deposits from third party distributors related to the Picture. On Schedule A/B, Debtor has listed a savings account with Banc of California described as follows: "these funds are for the benefit of the producer of the production known as Charlie the Wonderdo[sic]; Debtor claims no interest in these funds." The total sum on deposit reflected in the schedules is $414,000.  Wonderdog is the "producer" of *Charlie the Wonderdog* and has learned that distribution agreements have been entered with the at least 19, and potentially as many as 22, international distributors.  Pursuant to the information received, Wonderdog is informed and believes that international distributors transmitted at least $402,000 to the Debtor on account of the international distribution rights for the Picture licensed through the Debtor. (Wageman Decl. ¶ 9)

7.      Wonderdog is informed and believes that all international distributors who have

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1  committed to distribution agreements in international territories through the Debtor are committed

2  to completion of the licensing transaction and, in the absence of Debtor as a viable operating

3  entity, would like to transact directly with Wonderdog to complete the licensing, receive delivery

4  of the Picture, and exploit the rights granted for the term of the licenses. (Wageman Decl.¶ 10)

5     8.  Time is of the essence since the Picture must be completed by Wonderdog. Its

6  lender NBC, is entitled to adequate assurance that its collateral, including the distribution rights,

7  will not be impaired or lost. Moreover, the success of the Picture is dependent upon efficient and

8  timely promotion of the Picture in various film festivals and markets such as the Berlinale Film

9  Festival/European Film Market, Filmmart, Cartoon Movie, Cannes Film Festival/Marche Du

10  Film, Annecy Film Festival, Toronto International Film Festival, and the AFM.  Of particular

11  importance is the premiere of the film, which has been planned for June 2025 at the Annecy

12  International Animation Film Festival.  It is of critical importance that the Picture be promoted

13  and receive its premiere at this film festival. Potential U.S. distributors and international

14  distributors are eager to see the Picture and its premiere is planned for the Annecy festival.

15  Debtor, through it principal Edward Noelter, was an instrumental part of securing, planning, and

16  promoting the premiere at Annecy.  While Wonderdog and Icon are confident they can fully

17  perform all their obligations regarding the Picture, Debtor would appear to be hopelessly

18  insolvent, no longer operational, and unable to perform this contract, including by supporting the

19  premiere at Annecy in June 2025, or anywhere for that matter. (Wageman Decl. ¶ 11)

20     9.  Debtor represented and warranted in the SAA that it "has …financial ability to

21  enter into and perform its obligations under this Agreement…" (Wageman Decl. 3, Ex. 1 at ¶ 27,

22  p. 20)

23     10.  The SAA also obligates Debtor to indemnify Wonderdog from "any claim, loss,

24  liability or damage, including reasonable outside attorneys' and professional fees…. Arising from

25  the failure of any of the Party's representation or warranties." (Wageman Decl. 3, Ex. 1 at ¶28, p.

26  20)

27     11.  In the absence of a material breach resulting in termination of the SAA by

28  Wonderdog, although Debtor may solicit international distribution deals on a "co-representation"

1    basis with Debtor, Debtor retains the exclusive right to negotiate and conclude distribution

2    agreements with international distributors. (Wageman Decl. 3, Ex. 1 at ¶ 9.1, p. 8.)   Debtor is no

3    longer able to do so and Wonderdog seeks to pursue its remedies in mitigation.

4         12.    On December 20, 2024, the Debtor filed a voluntary petition under chapter 7 of the

5    Bankruptcy Code. The initial interim trustee has withdrawn and the replacement trustee, John

6    Pringle, has been appointed and accepted such appointment.

7                                              **II.**

8                                        **<u>ARGUMENT</u>**

9         13.    11 U.S.C. 362(d)(1) provides that the Court shall grant relief from stay "for cause,

10   including the lack of adequate protection of an interest in such property of such party in interest."

11   The movant bears the burden of establishing a "prima facie case of cause, at which point the

12   burden of proof shifts to the debtor to demonstrate adequate protection…." *In re Phoenix Pipe &*

13   *Tube, L.P.*  154 B.R. 197, 198 (Bankr. E.D. Pa. 1993*); see also,* 11 U.S.C. §362(g) (providing

14   that movant bears the burden of proof on lack of equity in property and imposes the burden of

15   proof on all other issues on the debtor).

16        14.    Debtor is bound by the terms of the SAA to continue to undertake sales agency

17   functions and be in a position to pay the Minimum Guaranty commencing on the Complete

18   Delivery Date, currently scheduled for June 1, 2025. (Wageman Decl. ¶ 3, Ex. 1 at ¶ 11, p. 11)

19   Wonderdog is informed and believes that Debtor has engaged in sales agency functions and has

20   collected at least $414,000, which is held in the Banc of California segregated account, for the

21   benefit of Wonderdog under the SAA.

22        15.    Since the Debtor is in liquidation under the control of a liquidating trustee, and in

23   the absence of any ongoing operations, there is no prospect for the realization of any value from

24   the SAA property rights, unless and until relief from stay is granted allowing Wonderdog to

25   complete production of the Picture, conclude the distribution agreements, and substantially

26   perform all obligations necessary for international distribution of the Picture. Should that fail to

27   occur, no revenue would be realized, third party claims by international distributors could result,

28   and corresponding rights to indemnification from the estate would arise for the benefit of

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

**NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (d)(1) and (2)**

1   Wonderdog, post-petition, creating claims against the estate. As such, granting relief from stay to

2   Wonderdog is not only required given the lack of adequate protection, but is a sound business

3   decision since it will realize the benefit of earned sales commissions arising from full and

4   complete performance of agency functions undertaken by Debtor.[2] It is appropriate for the Court

5   to grant relief from stay to to allow for the exercise of non-bankruptcy rights and remedies due to

6   a lack of adequate protection.  The Court should consider the relative harms to the parties caused

7   by the automatic stay. "As a court of equity, this court may consider the consequences of the stay

8   on the parties and the "balance of hurt" in tailoring relief appropriate for the factual scenario." *In*

9   *re Tudor Motor Lodge Associates, Limited Partnership* 102 B.R. 936, 954 (Bankr. D. N.J. 1989)

10          16.     For Wonderdog and its lender, the consequences are severe. No corresponding

11  harm to Debtor and its estate exists.[3] The Picture will be delivered soon and needs to be promoted

12  and presented at a major film festival, the June 2025 Annecy International Animation Film

13  Festival. International distributors are engaged and interested in full performance of their

14  contracts. Delays will only serve to compound claims against the Debtor and prevent Wonderdog

15  from effective mitigation of damages.  Relief from stay should be granted with the objective of

16  allowing for the mitigation of damages. *In re Consolidated Industries, Corp.* 330 B.R. 227

17  (Bankr. N.D. Ind. 2001).  Moreover, the agency and distribution rights are not necessary to an

18  effective reorganization. The Debtor is in chapter 7 with no ongoing operations and there is no

19  reasonable possibility of a successful reorganization within a reasonable time. *See United Savings*

20  *Ass'n of Texas v. Timbers of Inwood Forest Assocs.,Ltd.* 484 U.S. 365, 375-376 (1988*);  In re*

21  *Sunset Plaza, LLC*, No. 2:21-BK-19157-ER, 2022 WL 1085557, at *5 (Bankr. C.D. Cal. Apr. 8,

22  2022). The filing of the chapter 7 itself demonstrates that there is no cognizable prospect of

23  reorganization. *See In re Prestwood*, 185 B.R. 358,361 (M.D. Ala. 1995); *In re Lyons,* 19 B.R.

24  66,67 (Bankr.N.D.Ga. 1982).

25
_____

26  [2] Wonderdog is amenable to the Trustee deducting the sales agent's fee from the funds it holds,
    notwithstanding termination of the SAA due to a material breach by Debtor. The SAA sets forth

27  the sales agent fee as a percentage of Gross Receipts (Wageman Decl., ¶ 3, Ex. 1, ¶ 14, p. 13)
    [3] As noted, relief from stay will benefit the estate in that it will receive earned commissions and

28  mitigate damages and claims resulting from its insolvency.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# III.

## <u>CONCLUSION</u>

Based on the foregoing, Wonderdog respectfully requests that the Court enter an order:

    1.  Granting the Motion;

    2.  Granting relief from the automatic stay of 11 U.S.C. §362; and

    3.  Granting such other relief as the Court deems just and proper.

Dated:  January 17, 2025             Barnes & Thornburg LLP

                                   By:  */s/ Paul J. Laurin*
                                      Paul J. Laurin
                                      Attorneys for
                                      *Wonderdog 1 Productions, Inc.*

# **DECLARATION OF SHEA WAGEMAN**

I, Shea Wageman, do hereby declare as follows:

1.      I have personal knowledge of the facts set forth below, and if called and sworn as a witness, I could and would testify competently thereto. I am the President of Wonderdog 1 Productions Inc. ("Wonderdog"). Wonderdog is a special purpose production entity for the animated motion picture currently entitled "Charlie the Wonderdog" (the "Picture").  Wonderdog is a jointly owned affiliate of Icon Creative Studio Inc. ("Icon"), Canada's largest independently owned computer graphics animation studio. I am the President of Icon. Icon is the guarantor of financing provided by National Bank of Canada to Wonderdog for purposes of the production of the Picture.

2.      This declaration is filed in support of Wonderdog's *Motion for Relief from the Automatic Stay, or in the Alternative, for Adequate Protection* (the "Motion"). Pursuant to the Motion, Wonderdog requests that the Court grant relief from the automatic stay to allow Wonderdog and Icon to complete international distribution of the Picture, a process that was undertaken by the chapter 7 debtor, Cinema Management Group, Inc. (the "Debtor"), before the Debtor filed its bankruptcy petition on December 20, 2024. Alternatively, if the Trustee intends to assume the agreement as an executory agreement, Wonderdog requests that a deadline be established not more than 10 days from the date of the hearing on the Motion and that adequate protection be provided to Wonderdog to prevent a loss of value of the distribution rights and impairment of the personal property collateral of the National Bank of Canada, Wonderdog's secured lender. Adequate protection must include financial assurances and staffing adequate to continue to sell international distribution rights of the Picture in accordance with industry standards and on terms provided in the underlying agreement.

3.      On September 30, 2023, the Debtor entered into a sales agency agreement (the "SAA") with Wonderdog for the Picture. A true and correct copy of the SAA is attached hereto as **Exhibit 1**. Pursuant to the SAA, Debtor agreed to represent Wonderdog as a sales agent and master distributor in the distribution of the Picture in international markets other than the United

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

1    States and Canada. Wonderdog is the producer of the Picture and owns the copyright and all

2    ancillary rights to exploitation of the Picture in all territories. The Debtor's only rights in the

3    Picture are pursuant to the SAA as the sales agent with master distribution rights. The SAA is

4    presently in effect and became binding upon the occurrence of two conditions precedent: (1)

5    exchange of the fully executed SAA; and (2) delivery to Debtor of a mortgage of Copyright and

6    Security Interest in the form attached to the SAA. (Ex. 1, ¶ 2 at p. 1)

7        4.    The SAA imposes numerous critical obligations on Debtor during the production

8    of the Picture, with the objective of maximizing distribution and related licensing revenue around

9    the globe. The production of the Picture is ongoing with a final Complete Delivery Date of June

10    1, 2025.[4]

11        5.    Pursuant to the SAA, Debtor was appointed the non-exclusive agent of

12    Wonderdog for 20 years and received a license in the Picture to sublicense to foreign distributors

13    for a 5-year term. In exchange, Debtor agreed to pay Wonderdog $1.5 million as a minimum

14    guaranty payment (the "Minimum Guaranty"), which would be a fully earned, non-returnable fee.

15    Such payments were scheduled to be made in three $500,000 installments commencing on the

16    Complete Delivery of the Picture and thereafter 3 and 6 months after that date. Once receipts

17    from the international distribution of the Picture are sufficient to recoup contractually authorized

18    charges and sales commissions, then Debtor may recoup on a *pari passu* basis with Wonderdog

19    that amount of the Minimum Guaranty and thereafter share in the profits of international

20    distribution with Wonderdog.

21        6.    On June 19, 2024, Wonderdog entered into a financing agreement with National

22    Bank of Canada ("NBC") to provide production funding for the Picture in the amount of $1.5

23    million.

24        7.    Consistent with industry custom and practice, Wonderdog pledged the Minimum

25    Guaranty and revenue related to the Picture to NBC to secure the loan of $1.5 million.

26        8.    In the period since the execution of the SAA and prior to the filing of this

27

28    [4] Defined terms have the meaning set forth in the SAA attached as Exhibit 1.

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (d)(1) and (2)

1    bankruptcy case, Debtor has presold and obtained deposit-secured commitments from

2    international distributors for international distribution rights of the Picture. Based on

3    communications from Debtor in the months prior to the bankruptcy, I am informed and believe

4    that Debtor has entered a total of 22 international distribution agreements for the Picture.

5          9.      Debtor's bankruptcy schedules reflect that it has collected deposits from third

6    party distributors related to the Picture. On Schedule A/B, Debtor has listed a savings account

7    with Banc of California described as follows: "these funds are for the benefit of the producer of

8    the production known as Charlie the Wonderdo[sic]; Debtor claims no interest in these funds."

9    The total sum on deposit reflected in the schedules is $414,000. Wonderdog is the "producer" of

10   the Picture and has learned from documents provided in the ordinary course of Debtor's business

11   prior to the bankruptcy, and independent communications with international distributors seeking

12   information and confirmation of receipt of deposits, that distribution agreements have been

13   entered with 19 international distributors. Pursuant to the information received, Wonderdog is

14   informed and believes international distributors transmitted at least $402,000 to the Debtor on

15   account of the international distribution rights licensed though the Debtor for the Picture.

16   Wonderdog believes these deposits are being held in the account identified in the schedules.

17         10.     Wonderdog is informed and believes that all international distributors who have

18   committed to distribution agreement in international territories through the Debtor are committed

19   to completion of the licensing transaction and, in the absence of Debtor as a viable operating

20   entity, would like to transact directly with Wonderdog and Icon to complete the licensing

21   transaction, receive delivery of the Picture, and exploit the rights granted for the term of the

22   licenses. In the absence of a material breach resulting in termination by Wonderdog, although

23   Debtor may solicit international distribution deals on a "co-representation" basis with Debtor,

24   Debtor retains the exclusive right to negotiate and conclude distribution agreements with

25   international distributors. (Ex. 1, ¶9.1 at p. 8). It appears Debtor has no capacity to conclude

26   agreements.

27         11.     Time is of the essence since the Picture must be completed by Wonderdog. Its

28   lender, NBC, is entitled to adequate assurance that its collateral, including the distribution rights,

1    will not be impaired or lost. Moreover, the success of the Picture is dependent upon efficient and

2    timely promotion of the Picture in various film festivals and markets such as the Berlinale Film

3    Festival/European Film Market, Filmmart, Cartoon Movie, Cannes Film Festival/Marche Du

4    Film, Annecy Film Festival, Toronto International Film Festival, and the AFM.  Of particular

5    importance is the premiere of the film, which has been planned for June 2025 at the Annecy

6    International Animation Film Festival.  It is of critical importance the Picture be promoted and

7    receive its premiere at this film festival. Potential U.S. distributors and international distributors

8    are eager to see the picture and its premiere was planned for the Annecy festival. Debtor was a

9    instrumental part of securing, planning, and promoting the premiere at Annecy. While

10    Wonderdog and Icon are confident they can fully perform all their obligations regarding the

11    Picture, Debtor appears to be hopelessly insolvent, no longer operational, and unable to perform

12    under the SAA, including by supporting the premiere at Annecy in June 2025, or anywhere for

13    that matter.

14         12.    Debtor represented and warranted in the SAA that it "has …financial ability to

15    enter into and perform its obligations under this Agreement…" (Ex. 1, ¶ 27 at p. 20)

16         13.    The SAA also obligates Debtor to indemnify Wonderdog from "any claim, loss,

17    liability or damage, including reasonable outside attorneys' and professional fees…. Arising from

18    the failure of any of the Party's representation or warranties." (Ex. 1, ¶ 28 at p. 20)

19         14.    Wonderdog is prepared to allow recoupment of sales agency fees earned as of the

20    bankruptcy petition date as provided under the SAA for the benefit of the Debtor and its estate.

21         I hereby declare under penalty of perjury under the laws of the United States of America

22    that the foregoing is true and correct to the best of my knowledge, information, and belief.

23         Executed this 17th day of  January, 2025, in Canada.

24

25                                                        Shea Wageman

26

27

28

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

-4-

# EXHIBIT 1



As of September 30, 2023
("Effective Date")

**Wonderdog 1 Productions Inc.**
341 Water Street, Suite 200
Vancouver, British Columbia V6B1B8
Canada
Email: shea@iconcreativestudio.com

    Re:   *Charlie The Wonderdog*– Sales Agency Agreement
    Attn:  Shea Wageman

Gentlemen:

       When executed by both Parties, this letter will confirm the terms of the sales agency agreement ("Agreement") between **Wonderdog 1 Productions Inc.** ("Producer"), a Canadian corporation and **Cinema Management Group, LLC** ("Sales Agent"), a California Limited Liability Company for the Picture (as described in Paragraph 4) as follows:

**A.     REPRESENTATION PROVISIONS**

**1.**     **DEFINED TERMS**:  Terms with initial capitals are Defined Terms.  If not defined where they first appear, Defined Terms are defined in the IFTA® International Schedule of Definitions and the IFTA® International Schedule of Territories and Regions current as of the Effective Date, or otherwise interpreted by industry standard custom and practice.

**2.**     **CONDITIONS PRECEDENT**:  All of Sales Agent's obligations under this Agreement are conditioned upon prior satisfaction of the following conditions precedent: (a) mutual exchange of a fully executed Agreement by each party; (b) Sales Agent's receipt of a Mortgage of Copyright and Security Interest in the form attached executed and acknowledged by Producer.

**3.**     **APPOINTMENT**:
      3.1.    **Exclusive Appointment**: On the terms of this Agreement, Producer appoints Sales Agent to act, and Sales Agent agrees to act, as Producer's exclusive agent during the Agency Period (as set forth in Paragraph 6.1) with sole authority for negotiating and concluding license agreements on behalf of Producer with third parties ("Distributors") for exploitation of the Distribution Rights and Allied Rights (as set forth in Paragraph 7) in the Picture (as set forth in Paragraph 4.1) throughout the Exclusive Territory (as set forth in Paragraph 5.1.1) in the Authorized Languages (as set forth in Paragraph 5.4) during the Distribution Term (as set forth in Paragraph 6.2).  All such license agreements negotiated or concluded under this Agreement are Distribution Agreements.  During the Agency Period Producer will not negotiate or conclude any

Distribution Agreement in the Exclusive Territory but will refer all inquiries regarding any such Distribution Agreement to Sales Agent.

    3.2.    **Nonexclusive Appointment**: On the terms of this Agreement, Producer appoints Sales Agent to act, and Sales Agent agrees to act, as Producer's nonexclusive agent during the Agency Period (as set forth in Paragraph 6.1) for negotiating and concluding license agreements on behalf of Producer with third parties ("Distributors") for exploitation of the Distribution Rights and Allied Rights (as set forth in Paragraph 7) in the Picture (as set forth in Paragraph 4.1) in the Nonexclusive Territory (as set forth in Paragraph 5.1.2) in the Authorized Languages (as set forth in Paragraph 5.4) during the Distribution Term (as set forth in Paragraph 6.2), in conformity with Producer's co-representation activities as provided in Paragraph 7.1. All such license agreements negotiated or concluded under this Agreement are Distribution Agreements.

**4.**    **PICTURE REQUIREMENTS:**

    4.1.    **Picture**: The Picture means the motion picture currently titled *Charlie The Wonderdog* produced by Producer meeting all of the following Picture Requirements: the Picture Specifications, Actual Negative Cost; Key Dates, and Production Involvement set forth below.

    4.2.    **Picture Specifications**: The Picture as produced and delivered to Sales Agent must meet all of the following specifications:

        4.2.1.    Title: *Charlie The Wonderdog*, provided that upon request from either party the parties will negotiate in good faith to change the international title for the Picture with the goal of maximizing the international distribution potential for the Picture in which case the title will be changed to the international title so agreed with proper clearance;

        4.2.2.    Screenplay: based on the original screenplay of the same name written by Shea Wageman dated on or about April 27, 2023 as presented to Sales Agent provided this screenplay will be revised from the current 126 pages to between 90 and 100 pages which revised screenplay will be subject to Sales Agent's reasonable approval as provided in Paragraph 4.7;

        4.2.3.    Associated Talent: produced by Shea Wageman and Carson Loveday; directed by Shea Wageman; starring in the principal voice cast Owen Wilson (as Charlie) and a comparable internationally recognized voice talent as "Purdy" as reasonably approved by Sales Agent as provided in Paragraph 4.7;

        4.2.4.    Configuration: Canadian country of origin; primarily in the English language; formatted for a theatrical running time of not less than 84 minutes (excluding credits) or more than 95 minutes (including credits); shot in color on 3D CGI (not stereoscopic) and not animated in "2s"; completely finished and assembled, with fully synchronized sound, music and effects, telling a complete story, with no more than incidental stock footage; capable of receiving an MPAA/CARA rating no more restrictive than "PG"; and ready in all respects upon its Delivery for immediate exploitation throughout the Territory.

To meet these Picture Specifications the designated writer, producer, director, and principal voice cast must be credited as such in the main titles of the Picture. The Picture includes all available versions, such as a director's cut, airline and television versions, and all available bonus materials and outtakes.

    4.3.    **Actual Negative Cost**: The Picture must be produced for an Actual Negative Cost of not less than Twelve Million Canadian Dollars (CAD$12,000,000). Actual Negative Cost means the Direct Negative Cost of the Picture, reduced by any Reductions. Direct Negative Costs means all direct costs actually paid or incurred by Producer for development, production, post-production and completion of the Picture through the delivery of the final answer print, including: development fees;

Letter to Wonderdog 1 Productions Inc.                                    As of September 30, 2023
Re: *Charlie the Wonderdog* - Sales Agency Agreement                                    Page 3

rights fees; salaries to Persons actually rendering services or materials for the Picture; costs of materials, film and equipment; and other items of cost customarily charged as actual production costs in the motion picture industry, but excluding any completion bond fees and interest and finance charges. Producer may use its own studio resources (including soft resources), employees, artists, and infrastructure in the production of the Picture, and Sales Agent acknowledges that the Direct Negative Costs shall include an overhead amount allocated to Producer or its parent company in an amount anticipated to be between 10 and 12% of the total budget of the Picture on account of workstations, studio space, render farm, studio infrastructure, and pipeline systems. Reductions mean the following amounts to the extent received or used by Producer for the Picture: any recovery under any production insurance to the extent that the loss increased Direct Negative Cost; any trade, cash or volume discounts for costs included in the Direct Negative Cost; any sums from the sale or lease of sets, props, wardrobe, material or equipment to the extent their cost was included in Direct Negative Cost; and any rebate or credit under any completion bond. Producer must provide Sales Agent with a statement of the Actual Negative Cost of the Picture, certified as correct and complete by the production accountant or Producer's chief financial officer, and at least one credited producer on the Picture as part of Delivery.

      4.4.    **Key Dates**: Producer must produce the following elements for the Picture and delivery them to Sales Agent no later than the following Key Dates:

| | |
|---|---|
| **Initial Revised Screenplay**: | October 29, 2023 |
| **Initial Teaser**: | October 29, 2023 |
| **Later Revised Screenplay**: | January 15, 2024 |
| **Revised Teaser**: | February 29, 2024 |
| **Trailer**: | May 15, 2024 |

Producer will deliver the Initial Revised Screenplay (between 90-100 pages) to Sales Agent by the date set forth above. The Initial Revised Screenplay will be subject to Sales Agent's approval as provided in Paragraph 4.7. Producer will also deliver to Sales Agent by the Initial Teaser date above a teaser of no less than 1 minute duration showing a sample of the animation for the Picture for use at the 2023 AFM (Oct. 1 to Nov. 5, 2023). (Satisfactory receipt of such teaser is acknowledged.) Producer will deliver the Later Revised Screenplay (between 90-100 pages) to Sales Agent by the date set forth above. The Later Revised Screenplay will be subject to Sales Agent's approval as provided in Paragraph 4.7. Sales Agent hereby acknowledges that the Later Revised Screenplay has been received and is hereby approved. Producer will also deliver to Sales Agent by the Revised Teaser date above a new teaser of no less than 1 minute duration showing a different sample of the animation for the Picture for use at the 2024 European Film Market (Feb. 2024). (Satisfactory receipt of such revised teaser is acknowledged.) Producer will also deliver to Sales Agent by the above Trailer date a theatrical trailer for the Picture of no less than 5 minutes duration for use at the 2024 Cannes Marché (May 2024).

      4.5.    **Delivery Dates**: Producer must make Delivery the Picture to Sales Agent no later than the following Delivery Dates:

**WIP Screener**: March 1, 2025

**Progress Screener**: April 1, 2025

**Initial Delivery Date (with final mix)**:    May 1, 2025 (to screen the Picture at the Annecy Film Festival)

    **Complete Delivery Date**: June 1, 2025 (subject to extension under Paragraph 29.)

Producer must undertake all reasonable efforts to complete Initial Delivery in accordance with Paragraph 18 by the Initial Delivery Date above. In any case, Producer must make Complete Delivery of the Picture to Sales Agent in accordance with Paragraph 18 by *no later than* the Complete Delivery Date specified above.. Since the Delivery process includes time periods for

inspection and correction, Producer must initiate the process in sufficient time to assure its completion by the applicable delivery date.

4.6.   **Production Involvement**:  Producer will keep Sales Agent regularly informed on the status of the production throughout all phases of pre-production, production, and postproduction. Producer will provide Sales Agent with regular samples of the animation as the Picture proceeds with production as well as an opportunity to screen the Picture via a private link when a final version is ready.  Producer will not commit to a final cut of the Picture ("answer print") without first allowing Sales Agent this viewing opportunity.  Sales Agent will have three (3) business days after receipt of all sample materials and the final version to suggest to Producer reasonable changes to the Picture in order to enhance its commercial appeal in the parties' best interests.  Reasonable changes will include edit/pacing, picture/animation quality issues, special effects, lighting, dialog, music & effects, the soundtrack and sound mix, and configuration of the opening and closing credits of the Picture.  A persistent uncured material failure to provide Sales Agent with regular access to samples, or a failure to allow Sales Agent to screen each cut (including final cut), will allow Sales Agent to terminate this Agreement under Paragraph 32.

4.7.   **Approvals**:  Sales Agent will exercise approvals over revisions in the Screenplay and the VIP voice cast as follows:

4.7.1.   **Screenplay**:   Producer will submit to Sales Agent each version of the Screenplay as revised by the dates set forth in Paragraph 4.4.  Producer will have fifteen (15) days from receipt of the revised Screenplay to respond indicating and suggested revisions or requested changes.  If Sales Agent fails to respond before the end of the applicable period, the version of the screenplay submitted will be deemed approved.  If Sales Agent does respond Producer will use reasonable efforts to accommodate all requested revisions and changes (consistent with the Budget) and resubmit the changed Screenplay to Sales Agent and Sales Agent will have another fifteen (15) days to respond. This process will continue until the applicable version of the Screenplay is approved or deemed approved. Sales Agent's approval of the Initial Revised Screenplay will not prevent Sales Agent from requesting revisions or changes to the Later Revised Screenplay, even for scenes or elements previously approved, as their impact may change in the context of the Later Revised Screenplay.

4.7.2.   **Voice Cast**:   Producer will submit to Sales Agent the proposed casting for "Puddy" when reasonably available but before voice recording.  Sales Agent will have ten (10) days from receipt of the proposed cast to provide input.  If Sales Agent fails to respond before the end of the applicable period, the casting submitted by Producer will be deemed approved.  If Sales Agent does respond Producer will use reasonable efforts to accommodate the cast suggested by Sales Agent (consistent with the Budget).  Producer's commitment to the casting for "Puddy" without providing required Notice seeking Sales Agent's approval will allow Sales Agent to cancel this Agreement under Paragraph 32.  Once the casting for "Purdy" is selected any proposed change will be subject to Paragraph 4.8.  Sales Agent acknowledges that the talent cast for the role of "Puddy" will not be a VIP cast but will be a Canadian performer engaged pursuant to a UBCP/ACTRA Performer Agreement in order for the Picture to satisfy the requirements applicable to the Canadian federal and provincial tax credits (collectively, the **"Tax Credits"**) which will be utilized to partially finance the Picture.

4.8.   **Changes in Picture Requirements**:  If Producer seeks to change any of the above Picture Requirements the following will apply:

4.8.1.   **Key Elements**:  The following Picture Requirements are Key Elements: producer, director, principal voice cast, MPAA/CARA rating, language, running time, and Key Dates.  (The Delivery Dates are not subject to change.)

4.8.2.   **Approval**: Sales Agent will have a right of approval over any change in a Key Element.  If Producer desires to change a Key Element, Producer must give Sales Agent Notice of the proposed change at least ten (10) days before committing to the change unless exigencies of

production demand a shorter time, in which case Producer's Notice will indicate the time in which Sales Agent must respond, in no case less than twenty-four (24) hours.  If Sales Agent fails to respond before the end of the applicable period, the change will be deemed approved.  If Sales Agent gives Producer timely Notice of disapproval then the Parties will timely cooperate in good faith to find a mutually acceptable alternative, provided will have the right to approve any change such approval not to be unreasonably withheld or delayed.  Producer's commitment to any change in a Key Element without providing required Notice or without Sales Agent's approval will allow Sales Agent to cancel this Agreement under Paragraph 32.

       4.8.3.  **Consultation**: Sales Agent will have a right of prior consultation over any change in a Picture Specification that is not a Key Element. If Producer desires to change any such Picture Specification, Producer must give Sales Agent Notice of the proposed change at least ten (10) days before committing to the change unless exigencies of production demand a shorter time, in which case Producer's Notice will indicate the time in which Sales Agent must respond, in no case less than twenty-four (24) hours.  If Sales Agent fails to respond before the end of the applicable period, the change will be deemed approved.  If Sales Agent gives Producer timely Notice of disapproval then Producer will give full, fair and reasonable consideration to Sales Agent's input before committing to the change.  A persistent failure to consult with Sales Agent as required in this Paragraph will allow Sales Agent to cancel this Agreement under Paragraph 32.

    4.9.  **Picture Financing**: Sales Agent undertakes to enter into customary subordination and non-disturber agreements of all production liens and security interests to the financiers of the Picture (including the interim financier of the Tax Credits and the Advance (per Paragraph 11.1), provided that nothing contained in any such document shall interfere or impede or disturb any of Sales Agent's rights and entitlements hereunder. However, to the extent that Sales Agent is asked to obtain or cooperate in obtaining documents from Distributors requested by the any financier, including notices of assignment and the like, Sales Agent will be entitled to deduct and retain its Commission from any deposits or initial payments by Distributors under Distribution Agreements. As necessary or requested for the Picture financing Sales Agent will comply with Paragraph 16.1.

**5.  TERRITORY AND LANGUAGE:**

    5.1.  **Territory:** The Territory means all countries in the Exclusive Territory and Nonexclusive Territory as follows

       5.1.1.  **Exclusive Territory**: The Exclusive Territory means all countries Worldwide and their respective territories, possessions and protectorates *excluding* the Nonexclusive Territory and Canada and its territories, possessions and protectorates, as defined in the IFTA® Standard International Territory Definitions.  For avoidance of doubt, Producer expressly reserves all rights in and to the Picture in Canada

       5.1.2.  **Nonexclusive Territory**: The Nonexclusive Territory means the United States and its territories, possessions, and protectorates as defined in the IFTA® Standard International Territory Definitions.

    5.2.  **Changes in Territory**: Each country in the Territory means the country as its political borders exist on the Effective Date along with its then existing territories, possessions and protectorates. If during the Agency Period an area separates from a country in the Territory, then the Territory will still include the entire area which formed one political entity as of the Effective Date of this Agreement. If during the Agency Period an area is annexed to a country in the Territory, then Producer grants Sales Agent a right of First Negotiation to become the exclusive sales agent for the Distribution Rights in the Picture through the end of the Agency Period in the newly annexed area to the extent such rights become available.  Sales Agent may include comparable provisions in all Distribution Agreements.

5.3.    **Non-Contiguous Areas**:  Non-Contiguous Areas mean embassies, military and government installations, oil rigs and marine drilling sites, airlines-in-flight and ships-at-sea flying the flag of a country but not located within its contiguous geographic borders.  The Territory does not include the Non-Contiguous Areas of other countries located within the Territory, but does include Non-Contiguous Areas of each country in the Territory as necessary for exploiting any particular Distribution Rights.

5.4.    **Authorized Languages**:  The Authorized Languages are all Local Languages in each country in the Territory.

## 6.  AGENCY PERIOD AND DISTRIBUTION TERM:

6.1.    **Agency Period**:  The Agency Period means the period starting on the Effective Date and continuing until twenty (20) years after the earlier of Complete Delivery of the Picture to Sales Agent in accordance with Paragraph 18, the first public release of the Picture in the Territory by authority of Sales Agent, or the Complete Delivery Date in Paragraph 4.4.

6.2.    **Distribution Term**:  The Distribution Term means the license period for any Distribution Agreement duly concluded by Sales Agent under this Agreement.  Sales Agent may negotiate Distribution Agreements having a Distribution Term that starts during the Agency Period and extends for customary periods beyond the end of the Agency Term, not exceeding five (5) years without Producer's Approval per Paragraph 10.2.11  Producer will honor all grants of exclusivity in the Territory throughout the Distribution Term of any Distribution Agreement.

## 7.  DISTRIBUTION RIGHTS AND ALLIED RIGHTS:

7.1.    **Distribution Rights**:  The Distribution Rights means all exclusive rights in the Picture in all distribution media now know or later arising as defined in the attached IFTA® International Schedule of Definitions including: Cinematic, Ancillary, PayPerView, Video, Pay TV, Free TV, VOD, and EST, along with customary uses such as Simulcasting, Catch-Up TV, IPTV, Covermount, Kiosk, and Partwork Sales and Souvenir Booklets in Asia.  For clarity, these definitions include all forms of VOD (*e.g.* TVOD (Transactional VOD), SVOD (Subscription VOD), FVOD (Free VOD), AVOD (Ad-supported VOD), and EST (Single Use, Limited Us, and Extended Use).  For purposes of this Agreement the Distribution Rights will include "Non-Fungible Tokens" meaning the right in Sales Agent's discretion to select excerpts from any animation for the Picture, including stills and renderings not used in the final version of the Picture, encode them in a blockchain application in general public use, and license them to third parties on a temporary or permanent basis.

7.2.    **Allied Rights**:  The Allied Rights means all customary rights as necessary or convenient to exploit the Distribution Rights, including the following, but subject to customary contractual restrictions with third parties identified to Sales Agent by Delivery: (i) creating and using advertising and marketing materials for the Picture, including trailers and clips (but only to the extent they do not generate residual or reuse fees without Producer's Approval as set forth in Paragraph 10.2); (ii) using the name, voice and likeness of Persons rendering materials or services on the Picture for advertising and marketing the Picture; (iii) creating and using dubbed, subtitled, voice-over, multi-track and other versions of the Picture and its embodied music in the Authorized Languages; (iv) editing, retitling or reformatting the Picture for censorship or release requirements, provided that there will be no creative editing of the Picture without first engaging in prior meaningful discussion with Producer about the proposed editing; (v) authorizing use of customary advertisements and commercial announcements in the Picture; (vi) authorizing sponsorships of the Picture; (vii) including the Picture in screenings to the trade in order to interest Distributors; (viii) adapting and reformatting the Picture in all sizes, gauges, formats and processes necessary or convenient for exploitation of any Distribution Rights; and (ix) authorizing covermount, special

packaging and value added uses.. Sales Agent will comply, and require all Distributor's to comply, with all contractual restrictions to third parties rendering services or materials to the Picture with respect to the exercise of all Allied Rights as identified to Sales Agent by Delivery. However, no inadvertent failure by Sales Agent or any Distributor to comply with any obligation owed to Producer or such third party in exercising any Allied Rights will be a material breach of this Agreement provided Sales Agent will take reasonable steps to cure prospectively any such failure promptly after Sales Agent receives Notice of such failure.

7.3.    **Producer's Marks**:  In using the title of the Picture or Producer's name, logo, banner, or other identified trademark on the picture ("Producer marks" or "marks"), Sales Agent will contractually require that at all times, Distributors follow good trademark practices subject to any Producer's requirements. All goodwill arising from use of the Producer's marks will inure to the benefit of Producer. If Producer determines that Sales Agent is using any of its marks improperly, Producer may give notice to Sales Agent of the improper use and required remedial action. If Sales Agent fails to timely remedy the improper use, Producer, upon Notice to Sales Agent may end Sales Agent's license to such use of Producer's marks.

7.4.    **Sales Agent's Marks**:  Sales Agent may use its name, logo, banner or other identified trademark ("Sales Agent's Marks") on the Picture and in advertising and marketing material for the Picture designating Sales Agent's services for the Picture. All goodwill arising from Sales Agent's use of its marks will inure to the benefit of the Sales Agent. If Sales Agent determines that Producer is using any of its marks improperly, Sales Agent may give Notice to Producer of the improper use and required remedial action. If Producer fails to timely remedy the improper use, Sales Agent, upon Notice to Producer, may end Producer's license to such use of Sales Agent's marks.

7.5.    **Reserved Rights**: The Reserved Rights means all rights in the Picture other than the Distribution Rights and Allied Rights including: Merchandising (excluding Souvenir Booklets in Japan), Soundtrack, Music, Live Performance, Publishing, Remake, Sequel and Spin-Off. Producer expressly reserves the Reserved Rights throughout the world.

7.6.    **First Negotiation**:  Producer also grants Sales Agent an exclusive right of First Negotiation for thirty (30) days throughout the Agency Period to become the exclusive sales agent for all Distribution Rights and Allied Rights in any Remake, Sequel or Spin-Off of the Picture whose production commences during the Agency Period.

7.7.    **Royalty Collections:**  Producer also authorizes Sales Agent, by itself or through an appropriate collecting organization, to collect on behalf of Producer all sums arising from any compulsory license fees, blank tape levies, or retransmission royalties if the actions generating such income occur within the Territory during the Agency Period or any applicable Distribution Term, no matter when such sums are paid. Royalty Collections Income means all such sums paid or payable directly from the applicable collecting organization(s) which will be included in Gross Receipts.

7.8.    **Anti-Piracy:**  Producer also authorizes Sales Agent to permit third-party anti-piracy services (*e.g.*, IP Echelon, Blue Efficience) to include the Picture in their services in order to pursue any piracy or unauthorized use of the Distribution Rights or Allied Rights within the Territory during the Agency Period and any relevant Distribution Term. Anti-Piracy Income means all such sums paid or payable directly from such anti-piracy organization which will be included in Gross Receipts.

## 8.  HOLDBACKS:

8.1.    **Sales Agent**: Sales Agent agrees to abide by the following Holdbacks to the full extent allowed by Law and to negotiate to include them in relevant Distribution Agreements: (i) not to authorize the export of Videos from inside the Territory to areas outside the Territory; (ii)

not to authorize any broadcast of the Picture, including by satellite, from inside the Territory intended for primary reception outside the Territory, but incidental overspill will not be a breach of this provision; (iii) not to authorize sale within the Territory of decoders for any encrypted broadcast of the Picture originating outside the Territory; (iv) not to authorize making the Picture available on the Internet or a Closed Net except with customary provisions regarding technological measures to prevent access outside the Territory.

8.2.    **Producer**: Producer agrees to abide by the following Holdbacks to the full extent allowed by Law: (i) not to authorize or undertake release of the Picture in Canada before its release in the United States; (ii) not to authorize or undertake the export of Videos from outside the Territory to areas inside the Territory; (iii) not to authorize or undertake any broadcast of the Picture, including by satellite, from outside the Territory intended for primary reception inside the Territory, but incidental overspill will not be a breach of this provision; (iv) not to authorize sale outside the Territory of decoders for any encrypted broadcast of the Picture originating inside the Territory; (v) not to authorize or undertake making the Picture available on the Internet or a Closed Net except with customary provisions regarding technological measures to prevent access within the Territory; and (vi) not to authorize exploitation of any Remake, Sequel or Spin-Off of the Picture until at least one (1) year after First Release of the Picture in the Territory. Sales Agent acknowledges that Producer is obligated to release the Picture in Canada within two (2) years of completion in order to qualify for the Tax Credits, and that Producer may authorize or undertake the release the Picture in Canada before its release in the United States if deemed necessary by Producer to satisfy the requirements applicable to the Tax Credits.

## B.    PERFORMANCE PROVISIONS

## 9.    SALES AGENT SERVICES:

9.1.    **Co-Representation** Producer may solicit agreements with Distributors for exploitation of the Distribution Rights and Allied Rights in the Picture in the Nonexclusive Territory as follows. Before soliciting any Distributors in the Nonexclusive Territory, Producer must give Sales Agent Notice of the Distributor(s) Producer intends to solicit so that Sales Agent may co-ordinate licensing activities. From time to time, Sales Agent may send Producer a Notice of the Distributors Sales Agent has already contacted and Producer may not contact or solicit such Distributors. If Sales Agent has concluded or intends to conclude a Distribution Agreement that includes the Nonexclusive Territory Sales Agent will give Producer Notice to such effect and Producer will cease soliciting Distribution Agreements that conflict with such Distribution Agreement as Noticed by Sales Agent. Producer may not solicit any Distribution Agreement where the proposed Minimum Guarantee is less than the "Ask" price on the attached Ask-Take Schedule. If a Distributor duly solicited by Producer expresses interest in concluding a Distribution Agreement, then Producer may not conclude a deal memo or Distribution Agreement with the Distributor but must instead inform Sales Agent of the proposed deal including all essential terms and conditions. Sales Agent will then be responsible for concluding and documenting the Distribution Agreement consistent with the identified terms and conditions to ensure consistency with other Distribution Agreements and Sales Agent will undertake to service the Distribution Agreement and make collections under it.

9.2.    **Standards**: Sales Agent will undertake the customary services of a professional sales agent in the motion picture industry in representing the Picture under this Agreement. Producer understands and agrees that Sales Agent may represent other motion pictures in addition to the Picture which other motion pictures may compete with the Picture. Sales Agent will devote such time and resources to the Picture as Sales Agent believes in good faith are appropriate in light of Sales Agent's evaluation of the market potential of the Picture, but need not render services

exclusively for the Picture. Sales Agent will have no less rights than any member of the general public with regard to the intellectual property rights in and to the Picture.

9.3.     **Services Rendered – Agency Period**:  During the Agency Period, Sales Agent will: (i) represent, market and promote the Picture at film markets and festivals and by other customary means; (ii) solicit, negotiate and conclude Distribution Agreements; and (iii) meaningfully consult with Producer regarding Sales Agent's activities for the Picture, including preparation of marketing materials, licensing plan, and material terms of Distribution Agreements, upon reasonable request or as otherwise required under this Agreement.

9.4.     **Services Rendered – Distribution Term**:  During the Distribution Term for each Distribution Agreement Sales Agent will: (i) organize Delivery of the Picture, including providing appropriate notices of availability of delivery elements or materials, coordinating with laboratories, and arranging shipping; (ii) coordinate with Distributors to obtain necessary censorship approvals, tax certificates, import licenses, currency transmission certificates or like documents; (iii) provide required consultations and approvals such as for release dates or making other versions of the Picture; (iv) send notices of payments and reports due and use commercially reasonable efforts to collect all amounts due; (v) monitor Distributor compliance with Distribution Agreements; (vi) timely provide Producer with information that Sales Agent learns about unauthorized exploitation or piracy of the Picture; and (vii) render Statements and payments of Producer's Share as required under this Agreement.

9.5.     **Services Excluded**:  Sales Agent's services do not include undertaking any audit or arbitration for any Distribution Agreement or pursuing any anti-piracy action.  However, if after mutual consultation either Party desires to do so, then the other Party will meaningfully cooperate with the conducting Party in providing information and assistance needed to do so, including, as necessary joining in such action or providing a power of attorney.  The Party conducting the audit, arbitration or anti-piracy will be responsible for advancing all necessary costs and attorney's fees of so doing, but may recoup them from any recovery in the matter, with any remaining amount of such recovery being included in Gross Receipts.

9.6.     **Distribution Deal Terms**:  Subject to other terms in this Agreement, including Paragraph 10.3 regarding any Ask/Take Schedule, Sales Agent is authorized to negotiate and conclude all Distribution Agreements within commercially reasonable parameters.  However, without Producer's Approval (as set forth in Paragraph 10.2), Sales Agent will not conclude any Distribution Agreement in which the Picture is licensed: (i) to an Affiliate of Sales Agent; (ii) on a "straight distribution" basis where payments are based solely on performance and there is no license fee or minimum guarantee; or (iii) in conjunction with other motion pictures *unless* each motion picture in such Distribution Agreement has a separate minimum guarantee allocated on a fair and reasonable basis and no cross-collateralization is allowed among the licensed motion pictures.

9.7.     **Distribution Deal Documentation**:  For documenting Distribution Agreements, Sales Agent will use commercially reasonable efforts to utilize a form of agreement subject to Producer's Approval, with the IFTA® Model International Licensing Agreement Forms (including Deal Memo) being pre-approved.  However, Producer understands that Distributors may negotiate the terms of an approved form, may require use of their own form, or may require use of a form pre-negotiated with Sales Agent.  As such, Sales Agent is authorized to conclude Distribution Agreements using any agreement form as may be commercially practicable under the circumstances.  Producer authorizes Sales Agent to execute all Distribution Agreements (including deal memos) "as agent for" Producer. However, if requested by Sales Agent, Producer will timely execute any Distribution Agreement.  Sales Agent will provide Producer with copies of all Distribution Agreements concluded by Sales Agent promptly after their execution.

9.8.  **No Performance Guarantee**: The Parties acknowledge that exploiting motion pictures is a speculative business. Neither Party makes any representation or warranty, express or implied, regarding the ability to conclude any Distribution Agreement, to exploit the Picture, or to earn or collect any Gross Receipts or Producer's Share. Any estimates or projections about possible Distribution Agreements or performance of the Picture are statements of opinion *only*. Producer acknowledges that Producer's Share is merely an accounting entry and Sales Agent does not guarantee that Gross Receipts will be earned or Producer's Share will be payable in any amount. Sales Agent does not guarantee the performance of any Distributor under any Distribution Agreement.

## 10. PRODUCER INVOLVEMENT:

10.1.  **Producer's Cooperation**: Producer will fully and timely cooperate with Sales Agent as necessary for Sales Agent to render all services, including meaningfully and timely providing all required information, Producer's Approvals, consultations, and decisions. Producer understands that obtaining such co-operation as and when required may be necessary for Sales Agent to perform any service dependent on such cooperation.

10.2.  **Producer's Approval**: Producer's Approval means Notice to Sales Agent that Producer affirmatively approves or disapproves a matter for which approval is required or requested not to be unreasonably withheld or delayed. Approval will be deemed given if Sales Agent does not receive such Notice within twenty-four (24) hours during a film market or film festival attended by Sales Agent, or two (2) business days otherwise, of Producer's receipt of the request for approval. Sales Agent will give Producer prior Notice of Sales Agent's attendance at an applicable film market for film festival. Producer will provide a clear statement or approval or disapproval, so that an ambiguous or incomplete Notice will be deemed approval of any item not affirmatively disapproved. If Producer disapproves any matter, then upon reasonable request Producer will timely identify to Sales Agent any steps needed to obtain approval.

10.3.  **Ask/Take Schedule**: The attached Ask/Take Schedule indicates Sale Agent's estimates of target asking and taking amounts for Minimum Guarantees in the designated parts of the Territory. Producer acknowledges that any Ask/Take Schedule so prepared is based on timely Delivery of the Picture meeting all the Picture Requirements, including any approved changes. If the Picture so qualifies, then during the first two (2) years of the Agency Period Sales Agent will not conclude any Distribution Agreement with a Minimum Guarantee less than the applicable Take price on the Ask/Take Schedule without Producer's Approval. If the Picture materially fails to meet any Picture Specifications, and Producer does not cure such failure and this Agreement remains in effect, Sales Agent will make reasonable commercial efforts to meet the Ask/Take Schedule but may conclude Distribution Agreements based on Sales Agent's good faith business judgment for less than the Take price. Producer understands that Sales Agent does not guarantee that any particular right or territory can be licensed or that any particular ask or take price can be obtained.

10.4.  **Use of Ask/Take Schedule**: Producer acknowledges that any Ask/Take Schedule provided by Sales Agent contains proprietary information of Sales Agent regarding territory pricing. As such, Producer will maintain the Ask/Take Schedule in strict confidence and not disclose it to any third party without prior Notice of Sales Agent's consent in each instance. In no case may Producer include any Ask/Take Schedule in any private placement memorandum, securities offering or financing proposal without specific prior Notice of Sales Agent's consent given or withheld in Sales Agent's sole discretion, along with all disclaimers required by Sales Agent. This provision does not apply to any information that becomes publicly available other than through a breach of any confidentiality requirement or pursuant to a governmental order or subpoena.

## C.    PAYMENT PROVISIONS

**11. ADVANCE:**

    11.1.    **Amount**:    US$1,500,000 (One Million, Five Hundred Thousand United States Dollars)

    Sales Agent will pay Producer a non-returnable but fully recoupable Advance against Producer's Share (as defined in and subject to Paragraph 12.1) in the Base Currency and amount specified above in accordance with the provisions of this Agreement. If any amount of Producer's Share is paid on or before any installment of the Advance is due, then such amount of Producer's Share will be credited against and reduce the amount of the next installment of Advance when due.

    11.2.    **Conditions Precedent**: No installment of the Advance will be payable to Producer until satisfaction of all of the following conditions precedent: full execution of this Agreement and all attached schedules by Producer; Sales Agent's approval of the Chain of Title in accordance with Paragraph 19; Complete Delivery of the Picture in accordance with Paragraph 18; and delivery of a fully executed Statement of Actual Negative Cost as set forth in Paragraph 4.3.

    11.3.    **Installments:**    Sales Agent will pay Producer the Advance in the following installments, with each installment due after the *later of* satisfaction of the Conditions Precedent in Paragraph 11.2 or the event specified below:

    a.    US$500,000 upon Complete Delivery;

    b.    US$500,000 no later than three (3) months after Complete Delivery; and

    c.    US$500,000 no later than six (6) months after Complete Delivery.

Producer must provide Sales Agent with an invoice for each installment showing the amount due and the date the applicable event triggering payment occurred. Sales Agent will not be required to pay any installment until ten (10) days after receipt of each such invoice.

    11.4.    **Base Currency**: The Base Currency for calculating payments and recoupments under this Agreement is the currency in which the Advance is denominated (*i.e.*, US dollars).

    11.5.    **Consideration**: Producer agrees that any payment by Sales Agent under Paragraph 11.3 is in itself full and fair consideration for entering into this Agreement regardless of whether or not any Producer's Share becomes payable to Producer.

**12. PRODUCER'S SHARE:**

    12.1.    **Defined**: Producer's Share means the amount of Gross Receipts, if any, remaining after deducting and recouping on a continuous basis from fifty percent (50%) of Gross Receipts earned in the Nonexclusive Territory and one hundred percent (100%) of Gross Receipts earned in the Exclusive Territory in the following order of priority: (i) Sales Agent's Commission; (ii) Sales Agent's Recoupable Expenses; and (iii) the Advance paid by Sales Agent. For avoidance of doubt, fifty percent (50%) of Gross Receipts earned in the Nonexclusive Territory is payable directly to Producer as Producer's Share. The remaining fifty percent (50%) of Gross Receipts earned in the Nonexclusive Territory is available to Sales Agent to recoup it Commission, Recoupable Expenses, Advance, and Interest. If any Distribution Agreement is for the United States and other countries in the Exclusive Territory, then subject to Producer's Approval an equitable portion of such Gross Receipts will be allocated to the United States and the remainder to the other countries.

    12.2.    **Recoupment and Payment**:    Sales Agent will recoup its Commission and Recoupable Expenses, the Advance, and Interest, and calculate Producer's Share, on a continuous basis for as long as Gross Receipts are earned (as set forth in Paragraph 13.2).. If the Parties establish a Collection Account under Paragraph 16.2, then Producer's Share will be paid through the Collection Account. Otherwise, with each Statement rendered under Paragraph 17.2, Sales

Agent will pay Producer's Share, if any, to Producer or its designee at the place where Producer receives Notice or such other place as Producer may designate by Notice to Sales Agent.

      12.3.   **Returnable Payments**:  Producer acknowledges that returnable payments, such as deposits, are not includable in Gross Receipts or used to calculate Producer's Share until earned per Paragraph 13.2.  However, Sales Agent, in its sole discretion, may elect to calculate and pre-pay Producer's Share on any returnable payments received as if they had been earned.  In such case, if the payments later become returnable then Producer agrees upon demand to make a full refund of all pre-paid amounts received by Producer to the entitled Distributor, or, if Sales Agent has elected refunded the Distributor, to reimburse Sales Agent such amount.  As a condition to making any such pre-payment, Sales Agent may require that Producer provide to each affected Distributor appropriate assurances of full and timely repayment.

      12.4.   **Producer's Tax ID**:  Producer will timely provide Sales Agent with its current and accurate tax identification number and related information as needed to make any payment of Producer's Share.  If required by law, Sales Agent may withhold any payment of Producer's Share until such information is received.

      12.5.   **Currency Conversion**:  To the greatest extent possible, Sales Agent will make all calculations of Producer's Share in the Base Currency.  If any Gross Receipts are earned or Recoupable Expenses are incurred in another currency, Sales Agent will endeavor to convert them to the Base Currency using the exchange rate at the bank where the account for the Picture is maintained as utilized on the Statement on which the items are reported.  If Sales Agent finds it impracticable to convert any monies earned or incurred in another currency to the Base Currency, then to the extent permitted by Law, Sales Agent will deposit in Producer's name in a depository reasonably designated by Producer that portion of Producer's Share, in the other currency, to which Producer would be entitled if such monies were convertible to the Base Currency.  Such deposit will constitute payment in full to Producer of the amount so deposited.

## 13. GROSS RECEIPTS:

      13.1.   **Defined**:  Gross Receipts means all gross monies and other consideration paid or payable, or otherwise received by or credited to Sales Agent's account, without any deduction as and when "earned" (as defined in Paragraph 13.2) with respect to any Distribution Agreement that is substantially negotiated or concluded by Sales Agent under this Agreement, including Advances, Minimum Guarantees, Overages, Royalties and the like, as well as all Royalty Collections Income and Anti-Piracy Income.

      13.2.   **Earned**:  Gross Receipts will be deemed "earned" when unconditionally received by, forfeited to or credited to Producer or used for Producer's benefit or account, or are otherwise non-returnable or non-refundable to the payor, including amounts paid to third parties at Producer's direction, at any time during the Agency Period, any applicable Distribution Term, and thereafter for so long as Gross Receipts are paid or payable.  Deposits and like conditional payments will be deemed earned on the earlier of the date when they become non-refundable or they are forfeited due to an uncured breach by the Distributor.

      13.3.   **Producer's Failure of Performance**: This provision will only apply if Sales Agent has concluded a Distribution Agreement consistent with this Agreement (including Paragraph 9.6) and the Distributor then cancels the Distribution Agreement, refuses to make payment when due, or demands a refund of any payment *solely* because of a claimed default by Producer, such as a breach of warranty or Failure of Delivery.  In such a case, if Producer either acknowledges or fails to dispute that Distributor is correct in so doing, or if after an arbitration or other adjudication it is determined that Distributor is correct in so doing, then, solely for purposes of calculating Sales Agent's Commission and Recoupable Expenses and not Producer's Share, Gross Receipts will be deemed earned with respect to amounts paid or payable under such Distribution Agreement to the

same extent as if the Distributor had unconditionally made all such payments when due. Sales Agent will calculate Sales Agent's Commission and Recoupable Expenses that it would have recouped from such deemed Gross Receipts, and Sales Agent may set-off and deduct such amounts from any other payment of Producer's Share (but Producer is not obligated to make such payment from any source other than Producer's Share).

**14. SALES AGENT'S COMMISSION:**

14.1.    **Calculation**: Sales Agent will be entitled to a Commission based on the following percentages of all Gross Receipts earned under this Agreement (with any US$ figures converted to the Base Currency if not US$).

**20%** of one hundred percent (100%) Gross Receipts earned in the Exclusive Territory

**20%** of fifty percent (50%) Gross Receipts earned in the Nonexclusive Territory (*i.e.*, 10% of 100% of Gross Receipts in the Nonexclusive Territory including on Gross Receipts payable to Producer).

Other than as provided in Paragraph 4.9, Sales Agent's Commission will be deferred and payable from first Gross Receipts earned after Producer receives the entire Advance due under Paragraph 11.1.

14.2.    **Use of Subagents**: A subagent is an agent appointed by Sales Agent to represent the Picture in accordance with this Agreement and is not a Distributor. Sales Agent's Commission will be inclusive of the commission of any subagent used by Sales Agent. Customary licensees in specific territories for planning purposes are not subagents and their fees will be deducted as a Recoupable Expense provided that such fee may not exceed 10%.

**15. RECOUPABLE EXPENSES:**

15.1.    **Defined**:    Recoupable Expenses means all direct, auditable and verifiable, reasonable, third party, out-of-pocket, actual and customary costs and expenses paid or incurred by Sales Agent in representing the Picture under this Agreement for Marketing Expenses and Servicing Expenses. If any transactions involve an Affiliate of Sales Agent, such transactions will be no less favorable to Producer than if they were in arms' length transactions.

15.2.    **Marketing Expenses**: Marketing Expenses means all Recoupable Expenses for: (i) advertising, marketing and promoting the Picture; (ii) creating, manufacturing advertising, marketing and publicity materials; (iii) attending film markets and festivals where the Picture is actually introduced or made available to potential Distributors, including participation fees, travel expenses, office charges, and customary reasonable entertainment costs with potential Distributors as allocated to the Picture reasonably and consistently with Sales Agent's practice for other pictures similarly situated in good faith; (iv) retaining public relations or marketing firms for representing the Picture subject to Producer's Approval; (vi) undertaking promotional or trade screenings for the Picture subject to Producer's Approval; and (v) arranging promotional tours for talent associated with the Picture subject to Producer's Approval.

15.3.    **Servicing Expenses**: Servicing Expenses means all Recoupable Expenses for: (i) withholding, sales, use, VAT or like taxes charged on any Gross Receipts or Delivery Materials, but not including any franchise or income tax of Sales Agent; (ii) verifying, quality checking, insuring, handling and storing all Delivery Materials; (iii) undertaking searches and obtaining clearances or corrective documents for any items in the Chain of Title not duly delivered by Producer, including reasonable outside attorneys' fees and required payments to third parties, provided Sales Agent will consult with Producer in advance before incurring such fees or payments; (iv) accepting and verifying Delivery and creating and manufacturing Delivery Materials not duly delivered as provided in Paragraph 20; (iv) servicing Distribution Agreements including charges for creating, manufacturing, packaging, duplicating, shipping, handling and

storing required materials and charges for servicing agents (Backroom International being pre-approved); (v) international telephone, fax, postage, messenger and copying fees; (vi) notarial and consularization certificates, import licenses, governmental permits and the like; (vii) undertaking billings and collections under any Distribution Agreement, including currency conversion fees, escrow fees, and bank charges including for separate bank accounts; (viii) actual outside legal fees of up to US$2,500 for negotiating and concluding this long form Sales Agency Agreement and up to an additional US$5,000 for any interparty agreement, notice of assignment with Distributors, and related documents for financing for the Picture; and (ix) the actual cost of outside attorneys, auditors and accountants, to assist in negotiating or enforcing any Distribution Agreement, provided Sales Agent's use of any such outside professionals will be subject to Producer's Approval; and (x) other reasonable and customary servicing expenses.

15.4.   **Distributor Payment**: Sales Agent will use commercially reasonable efforts to require payment of all applicable Servicing Expenses by the Distributor under the affected Distribution Agreement but does not guarantee the ability to do so.  Any Servicing Expenses paid by the Distributor will not be included in Servicing Expenses recoupable by Sales Agent.

15.5.   **Allocation**: Where Sales Agent incurs any Recoupable Expenses for the Picture and other motion pictures, Sales Agent will allocate such expenses among all affected motion pictures on a fair and reasonable basis consistently applied.

15.6.   **Recoupment**: Sales Agent will pay all Recoupable Expenses, which Sales Agent may recoup from Gross Receipts in accordance with Paragraph 11.2.  Producer will have no liability to any third parties for any Recoupable Expenses not so recouped from Gross Receipts.

15.7.   **Marketing Commitment**: Sales Agent agrees to incur and spend not less than **One Hundred Thousand United States Dollars (US$100,000)** in Marketing Expenses for the Picture. Sales Agent will not incur more than **One Hundred Fifty Thousand United States Dollars (US$150,000)** in Marketing Expenses without Producer's Approval per Paragraph 10.2.  If Sales Agent incurs Marketing Expenses in excess of such amount without Producer's Approval, Sales Agent may not recoup the excess from Gross Receipts or otherwise seek to recover it from Producer.  Sales Agent agrees to market the Picture during at least each of the following film markets/festivals as they occur following Initial Delivery: Berlinale Film Festival/European Film Market, Filmmart, Cartoon Movie, Cannes Film Festival/Marche Du Film, Annecy Film Festival, Toronto International Film Festival, and the AFM.

## 16. COLLECTIONS AND PAYMENTS:

16.1.   **Picture Account**:  Except as provided in the next paragraph, Sales Agent will establish a separate bank account in the name of the picture and direct Distributors to make all payments of Gross Receipts for the Picture to such account.  At the request of Producer the account may be at the bank providing production financing.  Sales Agent may deduct its Commission and Recoupable Expenses from receipts in such account and will treat the balance as Producer's Share. As necessary or requested for the Picture financing Sales Agent will provide irrevocable instructions to Distributors to make payments of Gross Receipts for the Picture to this separate account and notice to the Distributors of the assignment of payments to production financiers as security for payment of the Advance and if necessary Sales Agent will enter into a deposit control agreement or the like over such account with production financiers for Producer's Share.   Sales Agent will pay Producer or its designee the amount of any Producer's Share as shown due on each Statement rendered by Sales Agent under Paragraph 16.2.

16.2.   **Collection Account**:  Upon request from Producer, Sales Agent and Producer will negotiate in good faith and timely conclude an agreement with a third party Collection Agent for making all collections and disbursements of Gross Receipts.  Producer will be solely responsible for all costs of establishing and maintaining the Collection Account.  Sales Agent will direct all

payments of Gross Receipts into the Collection Account established by the Collection Agent for the Picture (other than deposits as provided in Paragraph 12.3, which shall be paid to the Collection Account once Earned.) From all such Gross Receipts deposited in the Collection Account which have become earned as indicated by Notice from Sales Agent, Collection Agent may make disbursements in the following order: (i) first the Collection Agent will deduct its administration fees and charges; (ii) any residuals payable to talent rendering services or materials on the Picture; (iii) then the Collection Agent will pay Sales Agent its Commission, Recoupable Expenses, and Advance in accordance with an invoice presented by Sales Agent to the Collection Agent; and (iv) then the Collection Agent will remit the balance remaining, if any, to Producer or its designee(s) in accordance with the waterfall set forth in the Collection Agreement. In rendering Statements, Sales Agent will reconcile amounts paid from the Collection Agent to amounts shown due on the Statement.

**17. STATEMENTS AND AUDITS:**

    17.1. **Standards**: Sales Agent will maintain full and accurate books and records for the Picture at Sales Agent's principal place of business using generally accepted accounting principles on a consistent, uniform and non-discriminatory basis consistent with this Agreement. Sales Agent will maintain books and records on a consistent accounting basis (i.e.. cash or accrual) provided that Sales Agent may accrue amounts for Recoupable Expenses invoiced or reasonably expected to be payable before the end of the next accounting period.

    17.2. **Statements**: Sales Agent will render to Producer periodic Statements showing all Gross Receipts earned, Sales Agent's Commission, and Recoupable Expenses paid or incurred in calculating Producer's Share on a cumulative and current basis. If the parties do not establish a Collection Account, then Statements will be rendered no less frequently than one (1) month after each calendar quarter during the first three (3) years of the Agency Period and thereafter semi-annually, throughout the Agency Period and any applicable Distribution Term. If the parties establish a Collection Account, then in Sales Agent's discretion and required Statements and payments will be those rendered by the Collection Agent. Sales Agent will also send a copy of each Statement rendered to Producer to third parties identified by Notice from Producer to Sales Agent.

    17.3. **Incontestability**: All items shown on any Statement will be deemed incontestable twenty-four (24) months after the Statement is rendered unless Producer during such period gives Sales Agent Notice specifying each contested item in reasonable detail. Sales Agent may correct any item shown on any Statement, in which case the incontestability period will re-commence solely with respect to the corrected item. Sales Agent need not maintain any books or records for any item for more than three (3) years after the Agency Term.

    17.4. **Audits**: Producer may audit the books and records of Sales Agent regarding the Picture for any item not deemed incontestable using qualified public accountants upon at least one (1) month's prior Notice once annually during the Agency Period and until one year after the applicable Distribution Term. If the audit falls during a film market or festival, Sales Agent may delay the audit until two (2) weeks after its conclusion. If the audit uncovers an undisputed or later established underpayment then Sales Agent shall immediately pay Producer the amount of such underpayment, and if such underpayment is more than five percent (5%) of the amount shown due Producer on any Statement, then Sales Agent will pay on demand the reasonable audit costs of uncovering the underpayment up to the amount of the underpayment.

Letter to Wonderdog 1 Productions Inc.
Re: *Charlie the Wonderdog* - Sales Agency Agreement

As of September 30, 2023
Page 16

## D.    DELIVERY PROVISIONS

**18.    DELIVERY**:

18.1.    **Basic Provisions**:  Delivery of the Picture means actual, physical delivery to and acceptance by Sales Agent, at Producer's obligation and expense, of all Delivery Materials in the attached Delivery Schedule in accordance with this Agreement.  Initial Delivery means Delivery of all Initial Delivery Materials (as identified below) and Complete Delivery means Delivery of all other Delivery Materials on the Delivery Schedule.  Initial Delivery and Complete Delivery must be completed by the Initial Delivery Date and Complete Delivery Date, respectively, as set forth in Paragraph 4.4.  Delivery is considered to have occurred only on completion of both Initial Delivery and Complete Delivery.

18.2.    **Initial Delivery:**   The Initial Delivery Materials are all the following Delivery Materials as described on the attached Delivery Schedule: (i) Screening materials (Item 1.d – Digital Cinema Package, DCP JPEG 200 / HDCam / BluRay); (ii) trailer materials (Apple Pro Rez 422 HQ File on Hard drive with split sound stems or HD Cam with split sound stems); (iii) color stills (Item 9.c) in 300 dpi hi rez (3MB -5MB in size) and (iv) contractual credit block and credit restrictions (if any) (Item 9.g.).

18.3.    **Complete Delivery**:   The Complete Delivery Materials are all other Delivery Materials on the attached Delivery Schedule except as provided in Paragraph 18.4

18.4.    **Film Materials**: The parties acknowledge that at this time the international motion picture industry is in flux in the transition from theatrical film to digital elements.  Therefore, the parties agree that the following theatrical film elements on the attached Delivery Schedule need not be Delivered except as provided in this Paragraph: Items 1.a, 1.i, 1.j, 1.k, 2.a.  If Sales Agent reasonably believes it is necessary to deliver any such theatrical film elements to conclude a Distribution Agreement and the cost of making such elements in relation to expected revenue is financially viable (*i.e.*, after allowed deductions from expected payments Producer's Share will be positive), then Sales Agent may request Producer to deliver any such elements.  If Producer fails to so within a reasonable time to service the applicable Distribution Agreement Sales Agent may manufacture such elements itself as a recoupable Servicing Expense.

**19.    INSPECTION AND CURE**: All Delivery Materials must conform to the Picture as specified in Paragraph 4.1.  Sales Agent will have a period of thirty (30) days after receipt of *all* Delivery Materials to inspect them for technical quality and conformity to specifications ("Inspection Period").  If Sales Agent determines any Delivery Materials are not acceptable, Sales Agent will give Producer a Notice to such effect within the Inspection Period specifying the defect(s) in reasonable detail, with any defect not specified being waived.  Producer will then timely deliver substitute Delivery Materials to Sales Agent who will have another Inspection Period.  This process will continue with successive periods until either Sales Agent has accepted, or waived acceptance, of *all* Delivery Materials, or the Complete Delivery Date occurs, and nothing in this process will waive Producer's obligation to make Complete Delivery by the Complete Delivery Date.  Sales Agent may in its discretion waive Delivery of any particular Delivery Materials and agree that Delivery has occurred without them.  In such case, upon reasonable request, Producer will make good faith efforts make later Delivery of any waived Delivery Materials if commercially reasonable to service a pending Distribution Agreement.

**20.    CHAIN OF TITLE**: As indicated in the Delivery Schedule, Delivery includes providing Sales Agent with *all* documents in the Chain of Title demonstrating Producer's ownership or control of all Distribution Rights and Allied Rights in the Picture throughout the Territory for the Agency Period and any anticipated Distribution Term.  Sales Agent's counsel will have a period

Letter to Wonderdog 1 Productions Inc.                                    As of September 30, 2023
Re: *Charlie the Wonderdog* - Sales Agency Agreement                                    Page 17

of twenty (20) days after receipt of *all* documents in the Chain of Title to inspect them for legal sufficiency ("Review Period"). If counsel reasonably disapproves any document, Sales Agent will give Producer a Notice within the Review Period specifying the defect(s) in reasonable detail, with any defect not specified being waived. Producer will then timely obtain at Producer's expense necessary corrective documents. If Producer fails to do so within fifteen (15) days, then Sales Agent may do so, charging the cost of so doing as a Servicing Expense. Sales Agent's failure to request or Producer's failure to provide any documents in the Chain of Title as provided in this Paragraph will not limit or excuse any of Producer's representations, warranties or indemnities under this Agreement.

21.    **FAILURE OF DELIVERY**: Producer's failure to make Complete Delivery by the Complete Delivery Date will be a material breach of this Agreement. In such case, if Sales Agent in its discretion elects to cancel this Agreement, Sales Agent will promptly give Notice to such effect to Producer. Moreover, Sales Agent, in addition to any other right or remedy, may deem all outstanding Commissions and Recoupable Expenses under any concluded Distribution Agreements to be earned and payable as of such Complete Delivery Date. Sales Agent will also have the right, but not the obligation, to create and manufacture any required Delivery Materials and to use them to service applicable Distribution Agreements as Sales Agent deems appropriate. Sales Agent may charge and recoup one hundred and ten percent (110%) of the creation, manufacturing, shipping and handling costs of so doing as a Servicing Expense (*i.e.*, actual cost plus an overhead charge), which amount will be outside of any cap on Recoupable Expenses and which may be deducted from the Advance. This charge will be in addition to and not a waiver of any right or remedy Sales Agent may have for a failure of Delivery. In addition, Sales Agent will have the right to make a claim on the completion bond to the extent Sales Agent is a beneficiary.

**22. OWNERSHIP OF MATERIALS:**

22.1.    **Delivery Materials**: Producer will retain legal ownership of and title to all Delivery Materials and no granting of access to or possession of any Delivery Materials by Producer will constitute a "first sale." Instead, Sales Agent will only hold all Delivery Materials on loan for servicing Distribution Agreements. Upon reasonable request, Sales Agent will provide Producer with Notice of the location of all Delivery Materials to allow Producer to file appropriate statements evidencing Producer's rights. Sales Agent will exercise due care in safe-guarding all Delivery Materials and while they are used by Sales Agent.

22.2.    **Created Materials**: To allow effective servicing, Sales Agent will be the legal owner of all materials created or manufactured from the Delivery Materials, including those under Paragraph 21. Upon reasonable request, Sales Agent will provide Producer or its designees with free access to any alternate language tracks, subtitled tracks and dubbed versions, masters, advertising and promotional materials, artwork and other materials created or authorized by Sales Agent from the Delivery Materials. Producer will pay Sales Agent promptly on receipt of invoice for any cost to third parties for duplicating, shipping and handling such materials and any reuse fees applicable to their use ordered by Producer.

22.3.    **Return of Materials**: Upon expiry of this Agreement, Sales Agent will promptly at Producer's direction: (i) return all Delivery Materials to Producer at Producer's expense or provide Producer with a customary certificate of their destruction; and (ii) sell all then available materials created by Sales Agent to Producer for their unrecouped costs of manufacturing, shipping and storage, or provide Producer with a customary certificate of their destruction.

**23.    ACCESS TO OTHER MATERIALS:** If Producer has or will conclude a distribution agreement for the Picture with any distributor in the U.S., Producer will use good faith efforts to obtain for Sales Agent free access to all delivery, publicity and advertising materials for all versions of the Picture created by or for any such distributor, but any failure to do so will not be a breach of this Agreement.  Producer will give Sales Agent timely Notice whether Producer has obtained such access, free or otherwise, and the particulars for its exercise, provided if Producer has free access to any such materials Sales Agent will also have free access to those materials. Any fee for such access, or clearance or use costs for such materials advanced by Sales Agent, will be treated as a Recoupable Servicing Expense.

**E.    THIRD PARTY PROVISIONS**

**24.    THIRD PARTY PAYMENTS:** Producer will be solely responsible for making timely payments to all parties rendering services or materials to the Picture, including all profit participations, guild and union residuals, royalties and reuse fees, and music clearance fees in accordance with Paragraph 25.  Producer agrees to execute on demand any side-letter required by any applicable guild or union necessary to allow any collecting organization to collect or pay Royalty Collections Income for the Picture.  Producer understands that Sales Agent, as an agent and not a distributor, is not obligated to execute any Guild Assumption Agreement.  However, upon request Sales Agent will prepare a report of applicable "scale" residuals payable to \ guilds or unions with jurisdiction over the Picture at a cost of US$5000 per report.

**25. MUSIC**
    25.1.    **Cue Sheets**: As part of Delivery, Producer will supply Sales Agent with one (1) electronic file of a customary music cue sheet detailing the particulars of all music contained in the final version of the Picture and trailer such as the title of each composition, the composer(s), lyricist(s) and publisher(s) (including percentage of ownership if more than one publisher), copyright owner(s), performer(s), arranger(s), usage(s) (whether background instrument, background vocal, *etc.*), the number of such uses, the place of each composition showing the location and duration of each cue by the film footage or HD time code and running time of each cue and the performing rights society involved for each composer and publisher. Sales Agent will undertake to provide such cue sheets to Distributors for filing with the appropriate governmental agency or music rights society in the Territory.
    25.2.    **Synchronization**: Producer will obtain by Delivery, and maintain in effect for all relevant times throughout the Territory, all rights and clearances needed to synchronize all music embodied in the Picture and its trailer on all their Copies without cancellation or charge to Sales Agent or any Distributor for all applicable Distribution Terms.  Producer will be solely responsible for paying all royalties needed to obtain and maintain such synchronization rights and clearances.
    25.3.    **Mechanical**: Producer will obtain by Delivery, and maintain in effect for all relevant times throughout the Territory, all rights and clearances needed to make mechanical reproductions of all music embodied in the Picture and its trailer on all their Copies, including videos, without cancellation or charge to Sales Agent or any Distributor for all applicable Distribution Terms.  Producer will be solely responsible for paying all royalties needed to obtain and maintain such mechanical rights and clearances.
    25.4.    **Performance**: Producer will obtain by Delivery, and maintain in effect for all relevant times throughout the Territory, all rights and clearances needed to establish that the non-dramatic ("small") performing rights in all music embodied in the Picture and its trailer are either: (i) in the public domain; or (ii) owned or controlled by Producer sufficient to allow Sales Agent and any Distributor to exploit the Picture without additional payment for such rights; or (iii)

Letter to Wonderdog 1 Productions Inc.
Re: *Charlie the Wonderdog* - Sales Agency Agreement

As of September 30, 2023
Page 19

available by blanket license from a local music performing rights society affiliated with the International Confederation of Authors and Composers Societies (CISAC).

25.5.    **Additional Media:**  Producer will obtain by Delivery, and maintain in effect for all relevant times throughout the Territory, all rights and clearances needed to exploit all music embodied in the Picture and its trailer on all their Copies and promotional materials in all new media, including by Internet, Closed Network and Mobile Device, as well as "in context" and "out of context" rights for use on the trailer, without cancellation or charge to Sales Agent or any Distributor for all applicable Distribution Terms.  Producer will be solely responsible for paying all royalties needed to obtain and maintain such rights and clearances.

**26.    PRODUCER WARRANTIES:**  Producer represents and warrants to Sales Agent that with all of the following are true and correct and will remain so throughout the Agency Period and any applicable Distribution Term: (i) Producer is duly organized and in good standing in the Province of British Columbia with Entity. No. BC1468688 and has full authority to enter into and perform this Agreement; (ii) the Picture is fully original other than incidental stock footage or public domain material; (iii) Producer exclusively owns or controls all Distribution Rights and Allied Rights in the Picture throughout the Territory for the Agency Period and any relevant Distribution Term; (iv) Producer has not and will not appoint any other sales agent to represent any Distribution Rights in the Picture anywhere in the Territory throughout the Agency Period, and Producer will honor all grants of exclusivity in all Distribution Agreements for their entire Distribution Term; (v) Producer does not transfer any of Producer's interest in the copyright to Sales Agent; (vi) except as provided in Paragraph 25 for embodied music, by Delivery, Producer will have satisfied all obligations to and obtained all necessary authorizations from writers, producers, directors, composers, performers and all other Persons rendering materials or services for the Picture, to use their contribution to the Picture without cancellation, impairment or further payment; (vii) for embodied music, by Delivery, Producer will have obtained all necessary authorizations from authors, composers, lyricists and performers to use all synchronization, mechanical and performance rights as provided in Paragraph 25; (viii) nothing in the Picture, including its title or embodied music, infringes any intellectual property right (copyright, author's right, neighboring right, patent (the best of Producer's knowledge), trademark, *etc.*) or personal right (defamation, libel, slander, performer's right, right of publicity, moral right, *etc.*) of any Person; (ix) there are no pending (or threatened) claims, arbitration or litigation, nor any liens, security rights, charges or encumbrances other than customary guild security interests or a security interest in favor of the completion guarantor or production lender for the Picture, affecting the Picture or any Delivery Materials that might impair Sales Agent's free and unencumbered representation of any Distribution Rights or Allied Rights anywhere in the Territory for the Agency Period and any applicable Distribution Term; (x) the Picture (including any available coverage material) will be capable of obtaining an MPAA/CARA rating no more restrictive than "R" or its equivalent in major countries in the Territory; (xi) all documents in the Chain of Title are true and complete copies of the original, valid and to the best of Producer's knowledge enforceable according to their terms; and (xii) Producer has undertaken reasonable efforts to ensure that all suppliers of essential special effects and other digital information embodied in any Delivery Materials have not included any electronic self-help instructions that will cause such digital information to cease operation of its own accord in a manner that materially impairs any use of such Delivery Materials, but this does not apply to electronic Rights Management Information that prevents unauthorized use of the Delivery Materials.

**27.    SALES AGENT WARRANTIES:**  Sales Agent represents and warrants to Producer that all of the following are true and correct and will remain so throughout the Agency Period: (i) Sales Agent

is duly organized and validly existing under the applicable laws, rules and regulations of its state of formation and has full authority to enter into and perform this Agreement; (ii) it has the sole and exclusive right and the full legal and financial ability to enter into and perform its obligations under this Agreement; (iii) it has taken all necessary corporate action to authorize the execution and delivery of this Agreement, and the same does not and will not violate any provisions of the articles of incorporation or by laws of Sales Agent or any other agreements to which Sales Agent is a party; and (iv) no advertising or marketing materials created by Sales Agent will infringe any intellectual property right (copyright, author's right, neighboring right, patent, trademark, *etc.*) or personal right (defamation, libel, slander, performer's right, right of publicity, moral right, *etc.*) of any Person.

**28.    INDEMNITIES:** Each Party will indemnify, defend and hold harmless the other Party from any claim, loss, liability or damage, including reasonable outside attorneys' and professional fees, due to any third party arising from any failure of any of the Party's representations or warranties. Producer will include Sales Agent as an additional insured under Producer's policy of errors and omissions insurance for the Picture and provide Sales Agent with a customary certificate of such coverage as part of Delivery of the Picture.

## F.    SUSPENSION, EXTENSION AND FORCE MAJEURE

**29.    PRODUCER'S SUSPENSION RIGHT:** Producer may suspend and extend the Complete Delivery Date due to an Event of Force Majeure but for no more than sixty (60) days in total by Notice to Sales Agent. The Agency Period will be extended for the length of such suspension. Such suspension will not be a material breach of this Agreement. If any suspension continues beyond such period, then Sales Agent may cancel this Agreement upon Notice to the other Party.

**30.    EFFECT OF SUSPENSION:** If this Agreement is cancelled due to any suspension, then Producer must promptly refund to Sales Agent all unrecouped Recoupable Expenses.

**31.    FORCE MAJEURE:** Force Majeure means any fire, flood, earthquake, or public disaster; pandemic, epidemic or other public health emergency; strike, labor dispute or unrest; unavoidable accident; breakdown of electrical or sound equipment; failure to perform or delay by any laboratory or supplier; delay or lack of transportation; embargo, riot, war, insurrection or civil unrest; any Act of God including severe inclement weather; any act of legally constituted authority; inability to obtain sufficient material, labor, transportation, power or other essential commodity or service required for the conduct of a Party's business or any other cause beyond the reasonable control of either Party.

## G.    DEFAULT PROVISIONS

**32. DEFAULT AND REMEDIES:**

    32.1.    **Notice and Cure**: Each Party will give the other Party Notice of any claimed default under this Agreement specifying the default in reasonable detail. If the defaulting Party fails to cure the default within fifteen (15) days after receipt of Notice for a monetary default or thirty (30) days after receipt of Notice for any other default, the aggrieved Party may pursue any available right or remedy for such uncured default. However, the failure to Deliver the Picture by the Complete Delivery Date is a default that is not subject to cure and no cure period need be provided for such a default.

    32.2.  **Recoverable Damages**: Each Party may only seek to recover incidental or direct damages occasioned by any default. Each Party waives any right to seek special, consequential or punitive damages, including "lost profits." This waiver is an independent covenant that survives the failure of essential purpose of any other remedy, even if limited.

    32.3.  **Termination**: If Sales Agent is in uncured default (*i.e.*, default after receipt of Notice and chance to cure) for failure to pay any installment of the Advance when and in the amount due, then Producer may give a Notice of termination to Sales Agent and this Agreement will terminate on the date for termination set forth in the Notice. Otherwise, once the Advance is paid, Producer will have no right to revoke, disaffirm, terminate, cancel, or rescind this Agreement or any authority granted to Sales Agent, nor to seek any injunction or equitable remedy or prevent Sales Agent's representation of the Picture, Producer's sole remedy in all such cases being limited solely to an action at law for an accounting or Recoverable Damages. Sales Agent's appointment is coupled with an interest to allow Sales Agent to make recoupments of its Commission, Recoupable Expenses, Advance, and Interest as contemplated in this Agreement. Sales Agent will have the right to terminate this Agreement by Notice to Producer at any time after any uncured material default by Producer, or for failure to make Delivery by the Complete Delivery Date, or as set forth in Paragraph 4.6.

    32.4.  **Effect of Termination:** In case of termination, each Party will retain all its rights and remedies, including all claims for damages, Commissions, and Recoupable Expenses due for any performance rendered up to the time of cancellation. For any then existing Distribution Agreements, either: (i) Sales Agent will continue to service all Distribution Agreements substantially negotiated or concluded by Sales Agent up to the time of termination, including collecting all Gross Receipts and making recoupments under Paragraph 12.2 attributable to such Distribution Agreements, but Sales Agent may not negotiate any new Distribution Agreements; or (ii) alternatively, if the Parties mutually agree, Producer will assume all Distribution Agreements substantially negotiated or concluded by Sales Agent up to the time of termination and make all payments of Sales Agent's Commission and Recoupable Expenses from Gross Receipts as earned under such Distribution Agreements. Sales Agent may include in any Distribution Agreement a provision that Producer will have no right to terminate, cancel, or rescind such Distribution Agreement, or to seek any equitable relief to enjoin or restrain the Distributor's exploitation of the Picture, Producer's sole remedy for any breach of the Distribution Agreement being limited to monetary damages.

    32.5.  **Equitable Relief:** Producer agrees that the Distribution Rights are of a unique artistic or intellectual value, the loss of representation of which cannot be fully compensated by monetary damages, so that Sales Agent will have the right to seek equitable relief, including an injunction, for a default by Producer to the extent such relief may otherwise be available in law or equity. Nothing in this Agreement prevents Producer from seeking equitable relief for any attempted exploitation of any Distribution Rights or Allied Rights in the Picture outside the scope of this Agreement or any applicable Distribution Agreement.

**33.**  **ARBITRATION:** Any dispute arising under this Agreement, including with respect to any right or obligation that survives termination or cancellation, will be administered and resolved by final and binding arbitration under the IFTA® Rules for International Arbitration in effect as of the Effective Date ("IFTA® Rules"). The IFTA® Rules are available online at the following address: http://www.ifta-online.org. Each Party waives any right to adjudicate any dispute in any other court or forum *except* that a Party may seek interim relief as allowed by the IFTA® Rules. The arbitration will be held in the Forum and under the Governing Law designated in this Agreement, or, if none is designated, as determined by the IFTA® Rules. The arbitration will be decided in accordance with the Governing Law. The Parties will abide by any decision in the arbitration and

any court having jurisdiction may enforce it. The Parties submit to the jurisdiction of the courts in the Forum, with respect to interim relief, to compel arbitration or to confirm an arbitration award. The Parties agree to accept service of process in accordance with the IFTA® Rules and agree that so doing satisfies all requirements to establish personal jurisdiction over the Parties. The Parties waive the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

## H.    GENERAL PROVISIONS

**34.    CREDIT**: Sales Agent will be entitled to add its logo before the main credits of the Picture as released in the Territory and in related advertising, marketing and publicity material.

**35.    NOTICES:**

35.1.    **Notice**:  A Notice means any communication required or allowed under this Agreement. All Notices must be in a record authenticated by the sender. A "record," as set forth in the Electronic Records And Signatures In Commerce Act ("E-Sign"), 15 U.S.C. § 7006(9) means "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form," and includes both a "writing" (*e.g.* pen and ink on paper) and an e-mail (*e.g.* electronic communication), but a text message alone will not be deemed a "record." Notice sent by personal delivery or mail will be effective when received. Notice sent by fax or e-mail will be effective when the sender receives an acknowledgement showing receipt by the recipient. A Notice of Breach, Termination or Cancellation sent by fax or e-mail must be accompanied by Notice sent by non-electronic means and will be effective only when the non-electronic communication is received.

35.2.    **Place to Send Notice**: All Notices must be sent to a Party at its address on the Cover Page, except a Party may change its place for notice by Notice duly given. If a Party is no longer located at its place for Notice, the sender may give Notice by sending Notice to the receiving Party's last known address and providing a copy to a public official, if any, in the jurisdiction where such address is located designated to receive notice for absent parties, such as a Secretary of State, Company Commissioner or other appropriate authority.

35.3.    **Time Periods**: All time periods in this Agreement based on Notice run from the date the recipient receives, or is deemed to have received, such Notice.

**36.    ASSIGNMENT AND DELEGATION:**

36.1.    **PRODUCER:** Except as provided in this Paragraph, Producer may not assign this Agreement, or rights under it, or delegate any duties, in whole or in part, voluntarily or involuntarily, whether outright or for security, without prior Notice of Sales Agent's consent, and any attempt to do so without such prior Notice will be void and of no effect. For these purposes, an assignment includes an outright transfer, the granting of any lien or security interest, and a sale of substantially all of the assets of Producer or a conveyance of a majority of the membership interests or voting equity securities of Producer. As a condition to giving any consent, Sales Agent may require the assignee or delegate to assume in an authenticated record all obligations of Producer under this Agreement. However, Producer may without prior Notice of Sales Agent's consent: (i) assign, outright or for security any portion of the Advance or Producer's Share by giving Sales Agent Notice of the assignee and place for payment or otherwise as provided in Paragraph 16.1; or (ii) once Producer has made Complete Delivery and provided that Producer is not then in default, make an assignment to an entity which acquires substantially all of Producer's assets, which is at least financially responsible as Producer and which assumes in an authenticated record delivered to Sales Agent all of Producer's obligations under this Agreement.  Any

assignment or delegation allowed under this Paragraph will be binding on and inure to the benefit of the assignee or delegate, but will not release Producer from its obligations under this Agreement.

36.2.   **SALES AGENT:** Except as provided in this Paragraph, Sales Agent may not assign this Agreement, or rights under it, or delegate any duties, in whole or in part, voluntarily or involuntarily, whether outright or for security, without prior Notice of Producer's consent, and any attempt to do so without such prior Notice will be void and of no effect. For these purposes an assignment includes an outright transfer, the granting of any lien or security interest, and a sale of substantially all of the assets of Sales Agent or a conveyance of a majority of the membership interests or voting equity securities of Sales Agent. As a condition to giving any consent Producer may require the assignee or delegate to assume in an authenticated record all obligations of Sales Agent under this Agreement. However, Sales Agent may without prior Notice of Producer's consent: (i) make an assignment or delegation to any affiliated, parent or subsidiary company of Sales Agent; (ii) provided that Sales Agent is not then in default, make an assignment to an entity which acquires substantially all of Sales Agent's assets, which is at least financially responsible as Sales Agent and which assumes in an authenticated record delivered to Producer all of Sales Agent's obligations under this Agreement; (iii) assign or grant a security right in any portion of Sales Agent's Commission once earned; or (iv) authorize or appoint subagents for any Territories or Distribution Rights where customary to do so, provided the subagent agrees to be bound by this Agreement and Sales Agent is solely responsible for paying any commission due such subagent. Any assignment or delegation allowed under this Paragraph will be binding on and inure to the benefit of the assignee or delegate but will not release Sales Agent from its obligations under this Agreement.

**37.   SECURITY INTEREST:** Subject to paragraph 4.9, and in order to secure Sales Agent's authority to continue to represent the Rights in the Picture within the Territory in accordance with this Agreement and Sales Agent's right to receive and recoup its Commission, Recoupable Expenses, Advance and Interest ("Secured Obligations"), Producer grants to Sales Agent a continuing security interest in, and copyright mortgage on all the Rights in the Picture (and all its elements to the extent of Producer's rights) throughout the Territory for the Agency Period, all Delivery Materials delivered to Sales Agent, and all Distribution Agreements, proceeds and general intangibles arising from exploitation of the Rights, as further specified in the Description of Collateral in the attached Mortgage of Copyright and Security Interest. Sales Agent will have all rights of a secured party as provided in the Uniform Commercial Code as enacted in the State of California. Sales Agent may resort to its security interest for any attempt by Producer, or any successor in interest, to revoke, disaffirm, cancel, rescind or terminate this Sales Agency Agreement other than according to its terms. Producer will execute and deliver to Sales Agent such instruments consistent with this Agreement as Sales Agent may reasonably require to perfect or enforce its security interest, including and the attached Mortgage of Copyright, and authorizes Sales Agent to file such instruments with governmental authorities. Producer will give Sales Agent Notice of any change in its name, jurisdiction of organization, principal place of business, change in ownership, or transfer of substantially all of its assets promptly after becoming aware of such change but in any case later than ten (10) days after it occurs. Producer appoints Sales Agent as its attorney in fact (coupled with an interest) to execute and deliver any and all such documents consistent with this Agreement that Producer has failed to execute and deliver to Sales Agent within ten (10) days following Notice from Sales Agent requesting that Producer do so. Upon expiry of the Agency Period, Sales Agent will provide Producer with an appropriate release of Sales Agent's security interest. Sales Agent acknowledges this security interest will be subject and subordinate to any security agreement in favor of financiers for the Picture in accordance with any subordination and non-disturber agreement entered into pursuant to Paragraph 4.9

**38.    MISCELLANEOUS:**

38.1.    **Integration**: The Agreement represents the entire understanding of the Parties regarding its subject matter, superseding all prior negotiations, understandings, representations or agreements between them, if any.  Each Party expressly waives any right to rely on such prior negotiations, understandings, representations or agreements, if any.

38.2.    **Approvals**: All approvals or consents required or allowed under this Agreement may not be unreasonably withheld or delayed.

38.3.    **No Partnership**: Nothing in this Agreement creates a partnership or joint venture between the parties.

38.4.    **Modification:** No modification of this Agreement is effective unless evidenced by a record authenticated by both Parties.

38.5.    **No Waiver:** No waiver of any right or remedy under this Agreement will be effective unless contained in a record authenticated by the Party making the waiver.  The exercise of any right or remedy will not waive any other right or remedy.  No waiver or forbearance for one default will not be a waiver of any right or remedy for any other default.

38.6.    **Remedies Cumulative:** All remedies are cumulative, and resorting to one will not preclude resorting the same one or another one at any time.

38.7.    **Costs and Attorney's Fees:**  The prevailing Party in any dispute or arbitration under this Agreement will be entitled to recover its costs of arbitration including its share of the arbitrator's fees but *not* its attorney's fees in either prosecuting or defending the case (*i.e.*, each party will bear their own attorney's fees regardless of outcome).  This provision supersedes any contrary provision in the IFTA® Rules.

38.8.    **Terminology:** In this Agreement "and" means all possibilities, "or" means any or all possibilities in any combination, and "either...or" means only one possibility.  "Including" means "including without limitation."  "Must" or "will" means a Party has the obligation to act or refrain from acting; "may" means a Party has the right but not the obligation to act or refrain from acting.

38.9.    **Additional Documents**:  Upon reasonable request each Party will execute, acknowledge and deliver any additional documents or instruments necessary or convenient to evidence, secure or perfect the other Party's interest under this Agreement or to carry out its terms, and each Party authorizes the filing of such documents with appropriate public authorities.

38.10.    **E-Commerce Validation:**  No record relating to this Agreement, including this Agreement itself or any Notice, may be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation or transmission.

38.11.    **Governing Law:** This Agreement will be governed by and interpreted under the laws of California.  The predominant purpose of this Agreement is providing services with respect to intellectual property and not a sale of goods.

38.12.    **Forum:**  The exclusive Forum for conducting any arbitration or otherwise resolving any dispute under this Agreement will be the state or federal courts located in California, USA, and, to the extent allowed by the Governing Law, venue will be in the state or federal courts in Los Angeles County, California.  The effectiveness of this exclusive forum selection clause will be determined by the Governing Law.

If the above provisions correspond to your understanding, please sign this letter below where indicated and this will become a binding contract between the parties effective as of the Effective Date above.

CINEMA MANAGEMENT GROUP, LLC

By: _____

Edward Noeltner, President

**Accepted and agreed:**

**Wonderdog 1 Productions Inc.**

By: _____

Shea Wageman

Its: President / CEO

| IFTA® INTERNATIONAL SCHEDULE OF DEFINITIONS (2018 AFM VERSION) |
|---|

The IFTA® Definitions are available on-line at http://www.ifta-online.org.

**A.    Cinematic Rights Definitions:**

*Cinematic* means only *Theatrical, NonTheatrical* and *Public Video* exploitation of a Motion Picture.

*Theatrical* means the linear exploitation of a Motion Picture Copy only for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, that are open to the general public on a regularly scheduled basis and that charge an admission fee to view the Motion Picture.

*NonTheatrical* means the linear exploitation of a Motion Picture Copy only for direct exhibition before an audience by and at the viewing facilities of either organizations licensed for a primary purpose other than exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the Territory.

*Public Video* means exploitation of a Motion Picture Copy embodied in a Videogram only for direct exhibition before an audience in a mini-theater, an "MTV theater", or like establishment that charges an admission to use the viewing facility or to view the Videogram and that is not licensed as a conventional motion picture theater in the place where the viewing occurs.

**B.    Ancillary Rights Definitions:**

*Ancillary* means only *Airline, Hotel, Ship, Train* and *Vehicle* exploitation of a Motion Picture.

*Airline* means exploitation of a Motion Picture Copy only for direct exhibition in airplanes either by the airline carrier or by passengers using a Mobile Devices that are operated by an airline flying the flag of any country in the Territory for which Airline exploitation is granted but excluding airlines that are customarily licensed from a location outside the Territory or that are only serviced in but do not fly the flag of a country in the Territory.

*Hotel* means exploitation of a Motion Picture Copy only for direct exhibition in temporary or permanent living places, such as hotels, motels, apartment complexes, co-operatives or condominium projects, by means of an internal, closed-circuit television systems where the telecast originates within or in the immediate vicinity of such living places.

*Ship* means exploitation of a Motion Picture Copy only for direct exhibition in sea or ocean-going vessels that are operated by a shipping line flying the flag of any country in the Territory for which Ship exploitation is granted but excluding shipping lines that are customarily licensed from a location outside the Territory or that are only serviced in but do not fly the flag of a country in the Territory.

*Train* means exploitation of a Motion Picture Copy only for direct exhibition in a rail-based transportation system that is operated solely within the Territory.

*Vehicle* means exploitation of a Motion Picture Copy only for direct exhibition in commercially operated motor or electric vehicles, such as buses, taxis, or rideshares, used for transporting individuals solely within the Territory.

**C.    PayPerView Rights Definitions:**

*PayPerView* means only *Residential PayPerView* and *NonResidential PayPerView* exploitation of a Motion Picture.

*Residential PayPerView* means the encoded telecast of a Motion Picture Copy by Hertzian waves or over a cable service but not by use of Internet Protocol for television reception in homes or similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the Authorized Telecast of the Motion Picture at a time designated by the Authorized Telecaster for each viewing.

*NonResidential PayPerView* means the encoded telecast of a Motion Picture Copy by Hertzian waves or over a cable service but not by use of Internet Protocol for television reception in hotels or similar temporary living places where a charge is made to the viewer for the right to use a decoding device to view the Authorized Telecast of the Motion Picture at a time designated by the Authorized Telecaster for each viewing.

**D.     Pay TV Rights Definitions:**

*Pay TV* means only *Terrestrial Pay TV*, *Cable Pay TV*, *Satellite Pay TV,* and *Catch-Up Pay TV* exploitation of a Motion Picture.

*Terrestrial Pay TV* means over-the-air broadcast of a Motion Picture Copy by means of encoded Hertzian waves for television reception where a recurring charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Cable Pay TV* means an initial, originating transmission of a Motion Picture Copy by means of an encoded signal over cable for television reception where a recurring charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that transmits the Motion Picture along with other programming; (ii) to viewers in private living places for a right of periodic access to a channel or services that transmits the Motion Picture along with other programming substantially free of advertising; or (iii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Satellite Pay TV* means an initial uplink broadcast of a Motion Picture Copy by means of an encoded signal to a satellite and its downlink broadcast to terrestrial satellite reception dishes for television viewing located in the immediate vicinity of the reception dishes where a recurring charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Catch-Up Pay TV* means making available an unaltered digital Motion Picture Copy of the Authorized Telecast in encoded form for Internet Streaming by Authorized Subscribers to a Website operated by the Authorized Broadcaster for a limited period of time not exceeding thirty (30) days from the initial Authorized Telecast.

*Basic Pay TV* means Pay TV exploitation of a Motion Picture by means of other than Premium Pay TV.

*Premium Pay TV* means Pay TV exploitation of a Motion Picture by means other than Basic Pay TV and when the viewer is charged a separate and recurring fee for access to a specific Authorized Channel which is only available to its Authorized Subscribers and does not include third-party advertising.

**E.    Free TV Rights Definitions:**

*Free TV* means only *Terrestrial Free TV, Cable Free TV, Satellite Free TV,* and *Catch-Up Free TV* exploitation of a Motion Picture.

*Terrestrial Free TV* means over-the-air broadcast by Hertzian waves of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the Motion Picture, provided that for this purpose government television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

*Cable Free TV* means the originating transmission by coaxial or fiber-optic cable of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the embodied Motion Picture, provided that for this purpose neither government television assessments or taxes nor the regular periodic service charges (but not a charge for PayPerView or Pay TV) paid by a subscriber to a cable television system will be deemed a charge to the viewer.

*Satellite Free TV* means the uplink broadcast to a satellite and its downlink broadcast to terrestrial satellite reception dishes of a Motion Picture Copy for television viewing in private living places located in the immediate vicinity of a viewer's reception dish without a charge to the viewer for the privilege of viewing the embodied Motion Picture, provided that for this purpose government satellite dish or television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

*Catch-Up Free TV* means making available an unaltered digital Motion Picture Copy of the Authorized Telecast in encoded form for Internet Streaming by Authorized Subscribers to a Website operated by the Authorized Broadcaster for a limited period of time not exceeding thirty (30) days from the initial Authorized Telecast.

**F.    Video Rights Definitions:**

*Video* means only *Video Rental* and *Video SellThru* exploitation of a Motion Picture.

*Video Rental* means exploitation of a Motion Picture Copy embodied in a Videogram that is rented to the viewer from a retail location, at a kiosk, or through mail order only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Video SellThru* means exploitation of a Motion Picture Copy embodied in a Videogram that is sold to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

**G.    VOD Rights Definitions:**

*VOD* (View on Demand) means only *AdVOD, FVOD, SVOD* and *TVOD* exploitation of a Motion Picture.

*AdVOD* (or *Advertiser Supported VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is not required to pay a fee to view the Motion Picture Copy but where advertising, such as trailers or commercials, are included before, after, or within the continuity of the Motion Picture Copy, or where other advertising, such as banners, icons, hyper-text, meta-tags, or similar identifying information for a product or service or their supplier, is included on the same Website as the Motion Picture Copy.

*FVOD* (or *Free to the User VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is not required to pay a fee to view the Motion Picture Copy and there is no advertising content embodied in or associated with the Motion Picture Copy.

*SVOD* (or *Subscription VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is required to pay a set fee for a specified period to view the Motion Picture Copy along with other Motion Pictures available on the licensed service making available such Motion Pictures.

*TVOD* (or *Transactional VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is required to pay a set fee for a specified period to view the Motion Picture.

*Internet Streaming* means making available a digital Motion Picture Copy on the Internet in a manner that allows substantially continuous viewing of the Motion Picture Copy in substantially linear form on a Computer but which does not allow making another digital Copy except for a transient period of time necessary to facilitate such viewing.

**H.    EST Rights Definition:**

*EST* (Electronic Service Transaction) means only *Single-Use EST*, *Limited-Use EST* or *Extended-Use EST* exploitation of a Motion Picture.

*Single Use EST* means providing access to a digital Motion Picture Copy for Internet Downloading by a user who is required to pay a separate fee for each act of downloading and who only retains possession of or access to the Motion Picture Copy for a limited period of time in close proximity to the act of downloading as needed to view the Motion Picture.

*Limited Use EST* means  providing access to a digital Motion Picture Copy for Internet Downloading by a user who is required to pay a single fee for a specified number or period of downloads (*e.g.* unlimited downloads for $x$ days, or $x$ downloads maximum, or $x$ downloads within $y$ days) and who only retains possession of or access to the Motion Picture Copy for a limited period of time in close proximity to the act of downloading needed to view the Motion Picture for the authorized downloads.

*Extended Use EST* means providing access to a digital Motion Picture Copy for Internet Downloading by a user who is required to pay a separate fee to obtain possession of a digital copy of the Motion Picture Copy which may be viewed, but not further copied, without express limitations as to the number or duration of such viewings by the user.

*Internet Downloading* means providing access to a digital Motion Picture Copy on the Internet in a manner that allows its transmission to a Computer for making another exact digital Copy on such device and retaining such Copy for use for more than a transient period of time on such device after completion of the initial continuous period of transmission.

**I.    Additional Definitions:**

*Access* (*access, accessing*) means to make available a digital Motion Picture Copy on the Internet or a Closed Network in a manner that allows a user to copy, view, stream, download or use, or to obtain data or information about or related to, the Motion Picture Copy or its embodied Motion Picture.

*Affiliate* means any Person, including any officer, director, member, employee or partner of a Person controlled by, controlling or under common control with a Party.

*Attribution procedure* means a procedure to verify that an authentication, display, message, record or performance is that of a particular Person as an Authorized Subscriber, or to detect changes or errors in information.

*Authentication procedure* when used in connection with verifying an Authorized Subscriber using the Internet to access the Motion Picture means the same as an attribution procedure.

*Authorized Broadcaster* means the broadcaster authorized to exploit the Motion Picture in the Territory.

*Authorized Channel* means a specific television channel identified as authorized to broadcast a Motion Picture.

*Authorized Format* means a physical format in which Videograms embodying a Motion Picture are authorized to be exploited.

*Authorized Language* means a language in which a Motion Picture is authorized to be exploited.

*Authorized Language Use* means dubbing, subtitling, or parallel tracking in an Authorized Language in which a Motion Picture is authorized to be exploited.

*Authorized Subscriber* means a Person who has been verified by the Network or Platform through an Attribution Procedure as someone who is legally entitled to access and utilize a service and Access the licensed Motion Picture.

*Authorized Telecast* means either a Run or Playdate in which a Motion Picture is authorized to be exploited.

*Authorized Telecaster* means the telecaster authorized to exploit the Motion Picture in the Territory.

*Availability Date* means the first day after the end of the Holdback Period for a Licensed Right.  If the Availability Date refers to a category of Licensed Rights, it refers to the first date on which Distributor may exploit any Licensed Right in the category.  For example, the Pay TV Availability Date is the first date on which Distributor may exploit the Pay TV Terrestrial, Pay TV Cable or Pay TV Satellite Right.

*Broadcast* (*broadcast, broadcasting*) means the communication to the public of a Motion Picture Copy by means of Hertzian waves, wire, cable casting, wireless diffusion, radio waves or satellite in a manner that allows the Motion Picture Copy to be viewed simultaneously with the broadcast on a television, but without use of an Internet Protocol.

*Broadcast* (*broadcast*) means *telecast*.

*Broadcaster* (*broadcaster*) means *telecaster*.

*Computer* means an electronic device that accepts, manipulates and stores digital information or data in response to a sequence of instructions that can be defined, selected, or entered by the user including a desktop, laptop, mobile device, receiver, Smart TV, or tablet.

*Copy* means the embodiment of a Motion Picture in any form, including film, tape, cassette, disc, storage device or digital file, *provided that* where exploitation of a Licensed Right is limited to an Authorized Format then Copy with respect to such Licensed Right is limited to such Authorized Format.

*Closed Network* means an Internet Website or telecommunications network or system which is only available to Authorized Subscribers and Authorized Computers.

*Digital Rights Management (DRM)* means a sequence of software or hardware instructions embodied in, related to, or activated by a Motion Picture Copy that controls or manages copying, viewing, altering, or accessing the Motion Picture, its content or elements or associated Rights Management Information.

*Dubbed* means a Version of the Motion Picture in which the voices of performers on the original soundtrack are replaced with the voices of other performers speaking dialogue in an Authorized Language.

*DVD* means a digitally encoded electronic storage device that conforms to one of the DVD Specifications for Read-Only Disc or Blu-ray Disc and that is designed for use in conjunction with an electronic device in a way that causes a Motion Picture Copy to be visible for private viewing on the screen of a monitor or television.

*DVD Rights* mean the same as *Video Rights*.

*EIDR* means a universal digital object identifier assigned by a duly authorized EIDR authority that uniquely identifies a Motion Picture with all information about the registered Picture stored in a central registry. *EIDR* can be used for both physical and digital copies of a Motion Picture.

*Electronic record* means a record created, generated, sent, communicated, received, or stored by

electronic means.

*Exhibition* means the same as public performance.

*First Release* means the earliest of: (i) the date on which the Motion Picture must be released in the Territory as designated in the Deal Terms; or (ii) the date on which the Picture is first made generally available to the paying public in the Territory, either through exhibition in cinemas, sale of Videograms, or telecast; or (iii) six (6) months after Notice of Initial Delivery.

*First EST Release* means the date on which the Motion Picture is first made generally available for Internet Downloading by means of EST in the Territory.

*First Free TV Release* means the date on which the Motion Picture is first made generally available for public viewing by means of Free TV in the Territory.

*First Pay TV Release* means the date on which the Motion Picture is first made generally available for public viewing by means of Pay TV in the Territory.

*First Theatrical Release* means the date on which the Motion Picture is first made generally available to the paying public in cinemas in the Territory, excluding festival and awards screenings.

*First Video Release* means the date on which Videograms embodying the Motion Picture is first made generally available for sale to or rental by the paying public in the Territory.

*First VOD Release* means the date on which the Motion Picture is first made generally available for Internet Streaming by means of VOD in the Territory.

*First Worldwide Release* means the date on which the Motion Picture is first made available to the general public in any country worldwide in any medium, whether in cinemas, through sale of Videograms, by broadcast or telecast, or by EST or VOD.

*First Negotiation* means that Licensor will negotiate exclusively with Distributor in good faith for a period of ten (10) days after receipt of Notice by Licensor regarding the subject matter of Distributor's First Negotiation right before entering into negotiations regarding the matter with any other Person. If no agreement is reached within this time period, then Licensor will be free to stop negotiations with Distributor and then to negotiate and conclude an agreement regarding the proposed matter with any other Person on any terms.

*Guarantee* means the Minimum Guarantee and the Additional Guarantee, if any, set forth in the Deal Terms.

*Guarantor Certificate* means a certified statement in a record authenticated by a professional completion guarantor who has guaranteed completion and delivery of a motion picture that specific physical materials for the motion picture: (i) are of technical quality sufficient for customary commercial exploitation of applicable licensed rights; and (ii) have been placed in the hands of a shipper or air carrier for delivery f.o.b. to the required delivery location for such materials.

*Internet* means the interconnected facilities of a publicly available or closed communications network including mobile networks which uses Internet Protocol for data transmission to Computers.

*Internet Protocol* means the Transmission Control Protocol (TCP) and Internet Protocol (IP) or successors or substantially similar substitute protocols.

*International Standard Audiovisual Number* (*ISAN*) means an international standard audio-visual number assigned to a Motion Picture, or any of its Versions, that uniquely identifies the Motion Picture or the Version and is assigned by a duly authorized ISAN authority.    *Kiosk* means obtaining ownership or possession of a Videogram through an automated dispenser or so-called "kiosk."

*Laboratory Certificate* means a certified statement in a record authenticated by a professional motion picture or sound laboratory which holds physical materials for a Motion Picture confirming that such materials: (i) are of technical quality sufficient for customary commercial exploitation of applicable

Licensed Rights; and (ii) are available for access at the laboratory or facility under its customary terms and conditions.

*Law* means any statute or ordinance, whether municipal, state, national or territorial, any executive, administrative or judicial regulation, order, judgment or decree, any treaty or international convention, or any rule, custom, or practice with force of law.

*Linear* means the exploitation of a Motion Picture Copy in a sequential manner so that the Picture can be viewed from start to finish but without the ability of the viewer to start, stop and rewind.

*Live Performance* means performance of a Motion Picture or its Underlying Material by live players, whether by reading, performance, music-dramatic rendition or pantomime, where the performance occurs directly before a live audience or is broadcast live and without prerecorded material directly to the public, but excluding performances less than fifteen (15) minutes in length done for the purpose of advertising or publicizing the Motion Picture.

*Local Language(s)* mean the primary language(s) spoken in each country of the Territory.

*Mail Order* means Video SellThru exploitation in which the sale occurs by placing an order for and receiving delivery of the Videogram through use of the postal service or other shipping service and not at a retail establishment, but not including ordering a Videogram over the telephone or through the Internet or a Closed Network.

*Merchandising* means making, distribution, and sale of tangible goods, other than Copies of a Motion Picture or any of its Versions, that are based on or utilize the title of the Picture, the names, likenesses or characteristics of artists in their roles in a Motion Picture, or physical materials appearing in or used for a Motion Picture and that are made for sale to the general public, but not including Interactive Multimedia, interactive networked multimedia, Internet or Publishing.

*Mobile Device* means a portable Computer a substantial purpose of which is facilitating telephonic communication through a Closed Network.

*Motion Picture* means the licensed audiovisual work consisting of a series of related images that, when shown in succession impart an impression of motion, with accompanying sounds, if any.

*Network* means a set of interconnected data facilities or resources on a broadcast, cable or satellite system.

*NonLinear* means the exploitation of a digital Motion Picture Copy so that the viewer can manipulate viewing the Picture in a manner that alters its continuity or sequence of scenes.

*Original Language* means the primary language spoken in the dialogue of a Motion Picture in its original version.

*Outside Release Date* means the date on which Distributor must release the Picture in the First Release Medium, if so specified in the Deal Terms.

*Parallel Tracked* means embodying a Copy of the Original Language Version of the Picture in a Compact Disc or DVD that also contains a Dubbed or Subtitled Version of the Picture in the Authorized Language Uses.

*Parties* mean each Party to the Agreement.

*Party* means either Licensor or Distributor.

*Pay-Cable TV* means the same as Cable Pay TV.

*Person* means any natural person or legal entity.

*Platform* means a Website which provides its Authorized Subscribers access to Motion Pictures using Internet Protocol.

*Playdate* means one or more telecasts of the Picture during a twenty-four (24) hour period over

the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of reception on televisions within the reception zone of such telecaster during such period.

*Principal Photography* means the actual photographing of a Motion Picture, excluding second-unit photography or special effects photography, requiring the participation of the director and the on-camera participation of a featured member of the principal cast.

*Publishing* means exploitation of hard cover or soft cover printed publications of a novelization of a Motion Picture or artwork, logos, or photographic stills created for use in the Motion Picture that are included in such novelization.

*Quality Control Report* means a statement in a record authenticated by a professional motion picture or sound laboratory which attests whether physical materials for a Motion Picture identified in the report are of technical quality sufficient for customary commercial exploitation of applicable Licensed Rights.

*Record* means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

*Remake* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which substantially the same characters and events as shown in the existing Motion Picture are depicted.

*Rights* means rights, licenses, and privileges under copyright, trademark, neighboring rights or other intellectual property rights with regard to any type of exploitation of a Motion Picture or its Underlying Material, including the rights to duplicate, adapt, distribute, perform, display, and make available in accordance with the customary requirements of each specific licensed media.

*Rights Management Information (RMI)* means any information embodied, attached, related or appearing in or on a Motion Picture Copy that may include a copyright notice or other identifier, that identifies the copyright owner, producer, author, writer, director, performers or other Persons who have contributed to the making of the Motion Picture, or that describes any authorized terms and conditions for licensing or use of the Motion Picture or the Motion Picture Copy.

*Run* means one (1) telecast of the Motion Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of television reception within the reception zone of such telecaster once during such period. A simultaneous telecast over several interconnected local stations (*i.e.* on a network) constitutes one (1) telecast; a telecast over non-interconnected local stations whose signal reception areas do not overlap constitutes a telecast in each station's local broadcast area.

*Secondary Rights* means the right to grant, exploit or authorize any secondary use or exploitation of a Motion Picture or any of its elements, and to claim, collect and administer any Secondary Royalty Income generated by any such use of a Motion Picture to be collectively managed pursuant to any Law or collective contractual agreement, and administered by any government agency or collective management society or organization including the following: (i) use or sale of blank videograms and any other playback devices or storage media that facilitates private copying, (ii) the rental or lending of videograms or comparable Motion Picture Copies; (iii) the simultaneous retransmission or transmission including by direct injection of a Motion Picture; (iv) surcharges on ticket sales in connection with theatrical exhibition; (v) any communication or performance made to the public of the Picture(s) by television broadcasts in publicly accessible businesses or institutions (including, but not limited to, hotels, bars, pubs, hospitals, retirement homes, shops, schools and libraries), and other entities that communicate the Picture(s) directly to their patrons, customers, or students in the course of instruction; or the public viewing at no charge of videocassettes and videodiscs of the Picture(s) in institutions authorized by law, primarily including such institutions as schools, universities, and libraries, regardless of whether such videocassettes and videodiscs

are owned, rented or copied from a satellite or television broadcast or cable retransmission); (vi) any government copying; or (vii) any comparable use subject to collective management. Secondary Rights are exclusively reserved to the Licensor.

*Secondary Royalty Income* means all royalties, levies, rebates, remuneration and any other amounts generated or payable from the use and exploitation of the Secondary Rights of a Motion Picture. Secondary Royalty Income is the sole property of Licensor and not part of the Gross Receipts.

*Simulcasting* means providing on a Website operated by the Authorized Telecaster licensed to exploit Free TV Rights, an unedited, unaltered, and unabridged Free TV Authorized Telecast of the Motion Picture in the Authorized Language(s) in the Territory.

*Simultaneous Retransmission* means the simultaneous, unedited, unaltered and unabridged retransmission of the telecast of a Motion Picture by an operator other than the initial telecaster by cable, microwave (including MMDS), satellite, digital (including DTT and DVB), wireless or telephonic means for reception by the public of the initial telecast.

*Soundtrack* means the manufacture and exploitation of recordings in any form embodying all or any part of the soundtrack of the Motion Picture or any re-recording of all or any part of the soundtrack of the Motion Picture (packaged and labelled in such a way as to be identifiable with the Motion Picture) in lieu of the actual soundtrack thereof.

*Subtitled* means a Version of the Picture in which a translation of the original dialogue appears on the bottom of the screen.

*Telecast (telecast)* means the communication to the public of a Motion Picture Copy by means of Hertzian waves, wire, cable casting, wireless diffusion, radio waves or satellite in a manner that allows the Motion Picture Copy to be viewed simultaneously with the broadcast on a television, but without use of an Internet Protocol.

*Telecast (telecast)* means *broadcast*.

*Telecaster (telecaster)* means *broadcaster*.

*Transmit (transmit* or *transmission)* means to make available a Motion Picture Copy utilizing Internet Protocol by wire or wireless means.

*Underlying Material* means the literary and other material from which a Motion Picture is derived or on which it is based, including all versions of the screenplay, all notes, memos, direction, comments, ideas, stage, business, and other material incorporated in any version of the Motion Picture, and, to the extent necessary rights and licenses have been duly obtained, all existing novels, stories, plays, songs, events, characters, ideas, or other works from which any version of the Motion Picture is derived or on which it is based.

*Version* means an adaptation of a Motion Picture that is not accomplished by merely mechanical reproduction or use of minimal originality but instead uses original artistic or intellectual expression to create a new Work in its own right which contains materials or expressions of authorship not found in the original Motion Picture.

*Videogram* means a cassette, disc, or comparable magnetic or electronic storage device designed to be used with a reproduction apparatus that causes a Motion Picture Copy to be visible on a television screen for private viewing in a substantially linear manner.

*View-On-Demand* means the same as *Video on Demand*.

*Website* means a set of interconnected data resources at an addressable location on the Internet or a Closed Network which is accessible by other users or Authorized Subscribers of the applicable network.

*Wireless* means exploitation of a digital Motion Picture Copy by making it available on a Closed Network for over-the-air transmission to a Mobile Device which allows access to a Motion Picture Copy.

*Wireless system* means a Closed Network of integrated telecommunications facilities that allow system Subscribers to access an over-the-air digital signal embodying a Motion Picture Copy on a Computer including a Mobile Device.

*Work* means an original expression of authorship in the literary, scientific or artistic domain, whatever may be the mode or form of its expression.

| DELIVERY SCHEDULE |
|---|

## Animated Feature

All Delivery Materials set forth below shall be of the highest technical quality, free from defects and shall conform to the final edited version of the Picture and shall be in the same ratio of camera picture images in which the Picture was photographed. All Delivery Materials set forth below will be delivered either by Producer (a) making Physical Delivery of the following materials at Producer's sole expense, or (b) granting access to such materials by a fully executed irrevocable Laboratory Access Letter.

Producer will order and pay directly for 100% Quality Control Reports at Cinema Management Group's laboratory. The technical acceptance elements are marked with an asterisk (*). Should the evaluation prove that any of the master materials are not of acceptable quality, it is the Producer's responsibility to repair any faults at Producer's sole cost and expense. All subsequent Quality Control Reports and Spot Checks are also at Producer's sole cost and expense.

Any use of subtitles must be advised in advance to Cinema Management Group Servicing (chuck@backroom-international.com) as additional elements may be required based on this information.

Textless elements must include coverage for cell phone, tablet, TV screen, etc shots.

1.    **FEATURE PICTURE ELEMENTS** – Each of the following must be new, fully color-corrected and of the highest technical quality and condition. All picture and sound must be free of physical damage.
    **a. Digital Intermediate Files:** If the Picture was completed using a digital intermediate, physical delivery of all data files used to create the digital intermediate (10bit LOG DPX files) shall be archived to LTO7 format (or similar, upon approval) including any textless sections, with their corresponding texted frames on a separate tape. Similarly, if the Picture is photographed in HD (2K, 4K, etc.), all items referenced to "negative" or "print" herein shall mean High Definition (HD) video format (ie ArriRAW) and should be backed up onto LTO7, or similar.
    **b. 2D Digital Source Master (DSM):** Physical delivery of sound and picture data files created during the digital post-production process and used to create the 2D digital version of
    **c. * 2D Digital Cinema Distribution Master (DCDM):** Physical Delivery of One (1) Digital Cinema Distribution Master (DCDM) of the Feature, produced from the Digital Source Master (DSM) with 16-bit TIFF files, (uncompressed), in XYZ color space, in original theatrical aspect ratio, in separate reels, **with textless** backgrounds, saved onto hard drive(s)Synced Audio: 5.1 WAV files (L, R, C, LFE, Ls, Rs) at 24fps, in sync with the Picture reels, provided on the hard drive with the picture.
    **d. * 2D Digital Cinema Package (DCP):** Physical Delivery of One (1), **encrypted** 2K JPEG 2000 DCI compliant Digital Cinema Package of the Feature (DCP), produced from the DCDM files and color corrected to X'Y'Z' color space, in original theatrical aspect ratio, in separate reels, saved onto hard drive(s). Synced Audio: 5.1 WAV files (L, R, C, LFE, Ls, Rs) at 24fps, in sync with the Picture reels, one frame black at head and tail, provided on the hard drive with the picture. DCP to be delivered with the distribution Key Delivery Message (KDM)

(unlocking key). Cinema Management Group logo and presentation credit (as applicable) will be added to the DCP.

  **e. * 2D Digital Mezzanine Files**: Physical Delivery of the following: Apple ProRes HQ 422 1080p 23.98fps, 24fps & 25fps masters:( (i) original aspect ratio, and (ii) 1.78 aspect ratio with audio layout as below plus textless backgrounds, delivered on Hard Drive(s). Cinema Management Group logo and presentation credit (as applicable) will be added to the Mezzanine files.

- Ch 1 = Left Front
- Ch 2 = Right Front
- Ch 3 = Center
- Ch 4 = LFE
- Ch 5 = Left Surround
- Ch 6 = Right Surround
- Ch 7 & 8 = Stereo English Lt/Rt
- Ch 9 & 10 = Stereo M&E Lt/Rt (must be fully filled mix)

  **f. Closed Captions**: The English language closed captioning pop-up style text for the HD Pro Res OAR 23.98, 24, 25 versions of the final feature (.CAP and .SCC files).

  **g. Screening File**: Specs: File type: mp4 or m4v, 1080p, bit rate of 5Mbps. Audio: stereo. Clean, no Watermark. File size aprox 2GB. Longplay, download method (Hightail, Dropbox, etc.)

  **h.**  **Dub/Sub Reference Files:** One set reference Quicktime files: File type: H264Speed : 24fps to match the DCP reels, Time code: visible 24fps to match the DCP reels (start at 00:00 for each reel – 01:00:00:00, 02:00:00:00, etc), Countdown with 2 pop per reel, File size – per reel, each reel no more than 1.0GB, B/W picture, Audio: stereo, Watermark: CINEMA MANAGEMENT GROUP per below sample. Send by Aspera or other download method (Hightail, Dropbox, etc)



## 2. FEATURE SOUND ELEMENTS (on Hard Drive)

  **a.**  **\* 5.1 Printmaster + LT/RT:** Physical Delivery of the below 6-Track (5.1 mix) Printmasters of the Picture plus 2-trk LT/RT Printmaster containing a stereo configuration of left/center/right/left surround, right surround, sub woofer, LT, RT.

    One (1) Pro Tools master conformed to Pro Res Original Aspect ratio 1080p 23.98fps, 24fps, & 25fps masters
    One (1) Pro Tools format in reels @ 24fps to match DCP reels

  **b.**  **\* 6+2 M&E Master:** Physical Delivery of the below 6-track (5.1 mix) fully filled M&Es containing a stereo configuration of left/center/right/left surround, right surround, sub woofer, plus one track of extra or optional material containing any special sound elements peculiar to the Picture (e.g. grunts, groans, shouts, screams, breaths, echoes, foreign language dialogue, dialogue from on-screen radios / computers/televisions, etc. and dialogue track.

    One (1) Master conformed to Pro Res Original Aspect ratio 1080p

23.98fps, 24fps & 25fps masters
One (1) Mastert format in reels @ 24fps conformed to DCP reels

    **c.**    **6-trk DME:**  Physical Delivery of one (1) stereo mix master with separate stereo dialogue tracks, separate stereo music track and separate stereo effects @24fps conformed to DCP reels and long play to conform to the 23.98fps, 24fps, & 25fps Pro Res masters.

    **d.**    **5.1 Final Mix Stems:**  Physical delivery of all Mix Master Stems @ 24fps to conform to DCP reels and long play to conform to the 23.98fps, 24fps, & 25fps Pro Res masters.., Note that separate Foley stems are not accepted. Foleys shall be mixed into the Effects tracks.  The identifying labels should be clearly marked with stem and channel assignments.

        Separate 6-track element containing all Dialogue (L/LS/C/RS/R/sub);
        Separate 6-track element containing all Music (L/LS/C/RS/R/sub);
        Separate 6-track element containing all Effects (track assignments should be (L/LS/C/RS/R/sub).

Note that separate Foley stems are not accepted without prior written approval; Foleys shall be mixed into the Effects tracks.

    **e.**    **Musical Score and Source:** Physical delivery of One (1) CD of all source and score (undipped) or down loadable (Hightail, Dropbox, etc.).


**3.**    **TRAILER PICTURE ELEMENTS:**
    **a.**    **Digital Intermediate Files** – The original DI files, texted and textless, flat and scope.

    **b.**    **Digital Cinema Distribution Master (DCDM): One (1) Texted & One (1) Textless, Original Aspect Ratio:**  Digital Cinema Distribution Master (DCDM) of the Trailer, produced from the Digital Source Master (DSM) with 16-bit TIFF files, (uncompressed), in XYZ color space, in original theatrical aspect ratio, saved onto hard drive(s). Synced Audio: 5.1 WAV files (L, R, C, LFE, Ls, Rs) at 24fps, in sync with the Picture,  provided on the hard drive with the picture.

    **c.**    *    **Digital Cinema Package (DCP): One (1)Texted & One (1) Textless, Original Aspect Ratio (non encrypted)** 2K JPEG 2000 DCI compliant Digital Cinema Package of the Trailer (DCP), produced from the DCDM files and color corrected to X'Y'Z' color space, in original theatrical aspect ratio, saved onto hard drive(s). Synced Audio: 5.1 WAV files (L, R, C, LFE, Ls, Rs) at 24fps, in sync with the Picture, provided on the hard drive and made and down load.

    **d.**    *    **Digital Mezzanine Files**: One Texted & One Textless Apple ProRes HQ 422 (in original aspect ratio) with 23.98fps, 24fps 25fps frame rates, with audio layout same as feature Pro res files on Hard Drive and down load.


**4.**    **TRAILER SOUND ELEMENTS (on hard drive)**
    **a.**  *  **5.1 Printmaster + LT/RT:**  Physical Delivery of the below 6-Track (5.1 mix) Printmasters of the Picture with 23.98fps, 24fps 25fps frame rates plus 2-trk LT/RT Printmaster containing a stereo configuration of left/center/right/left surround, right surround, sub woofer, LT, RT.

    **b.**  *  **6+2 M&E Master:**  Pro Tools 6-track (5.1 mix) fully filled M&Es plus one track of extra or optional material containing any special sound elements peculiar to the Picture (e.g.

grunts, groans, shouts, screams, breaths, echoes, foreign language dialogue, dialogue from on-screen radios/computers/televisions, etc.) and dialogue track with 23.98fps, 24fps 25fps frame rates.

      **c.**      **6-trk DME:**  Physical Delivery of stereo mix master with separate stereo dialogue tracks, separate stereo music track and separate stereo effects track with 23.98fps, 24fps 25fps frame rates.

      **d.**      **5.1 Final Mix Stems:**  Physical Delivery of one (1) set of original Pro Tools mix master stems, containing all separate stereo 6-track dialogue stems, all separate stereo 6-track music stems, all separate stereo 6-track effects stems with 23.98fps, 24fps 25fps frame rates.


**5.**      **ACCESS ELEMENTS**

      **a.**      **Source and Feature Picture Elements:**  A fully-executed and acceptable Laboratory Access Letter giving Cinema Management Group irrevocable access to Producers DI files, DCDM, DCP and HD master elements.

      **b.**      **Sound Elements:**  A fully-executed and acceptable Laboratory Access Letter granting Cinema Management Group irrevocable access to Producers master Audio elements.

      **c.**      **TV Cover Materials and ADR:**  A fully-executed and acceptable Laboratory Access Letter giving Cinema Management Group irrevocable access to all alternate takes, cover shots, looped dialogue lines (ADR), and other material ("Cover Material") used to create the television version. The Cover Material shall be boxed separately and clearly marked for identification.


**6.**   **\***   **ADDED VALUE & PROMOTIONAL MATERIALS**

      Producer must physically deliver on Pro Res HQ 4:2:2 1080p 23.98fps, 24fps, 25fps files on HDD, any and all elements that are either produced by the Producer or domestic Theatrical/DVD distributor, including trailer, artwork, and bonus materials, fully cleared for international use, free of any access fees and ready for inclusion in the DVD master:  Delivery to Cinema Management Group of an EPK with a minimum running time of fifteen (15) minutes in the format(s) stated hereinabove shall be deemed an essential delivery element.


**7.**      **RECORDS, DOCUMENTS AND PUBLICITY MATERIALS**

All items below shall be delivered on a DVD and physically delivered.  All documents must be in the English language.

      **a.**      **Underlying Materials.** One (1) copy of the final shooting script of the Picture.

      **b.**      **Combined Dialogue and Action Continuity – Feature & Trailer**

- **Feature**: One (1) copy in the English language, including translations of all dialogue not in English, of the complete final dialogue and action continuity script conformed to the theatrical version of the Picture containing all dialogue, narration and song vocals, as well as a cut-by-cut description of the picture action (identified by time code that matches the DCP reels) in a form suitable for use in connection with dubbing and subtitling the Picture and conforming exactly to the photographic action and soundtrack of the Picture.

- **Trailer:** One (1) copy in the English language, including translations of all dialogue not in English, of the complete final dialogue and action continuity script conformed to the theatrical version of the Trailer containing all dialogue, narration and song vocals, as well as a cut-by-cut description of the picture action (identified by time code that matches the DCP reels) in a form suitable for use in connection with dubbing and subtitling the Trailer and conforming exactly to the photographic action and soundtrack of the Trailer.

c.     **Color Stills**.  A minimum of fifty (50) digital photos (at 300 dpi with file size of approximately 2-3MB).  All photographs shall be suitable for use in the preparation of advertising, exhibition and publicity material for the Picture including one sheet posters.  Producer shall deliver any and all releases from persons appearing in the photographs needed for Distributor's intended use thereof.  Each photograph shall contain notations or a separate statement identifying the persons and subject matter depicted therein.

d.     **Key Art**. One CD or DVD of the final key art with fully layered files.

e.     **Publicity Materials**.  One (1) typewritten copy and one (1) electronic copy of each of the following materials:

- All available press clippings
- Synopses
- Production Notes – such Production Notes must include, but not be limited to, a log line, a long synopsis, approved cast & crew biographies of each member of the principal cast and production staff, a director's statement and main & end titles. Notwithstanding anything to the contrary contained in this Delivery Schedule, delivery to Cinema Management Group of the Production Notes shall be deemed an essential delivery element.
- Behind the scenes footage
- Interviews and commentaries
- Any other publicity material created.

f.     **Final Main and End Credits**.  One (1) electronic file of the final main and end titles of the Picture as they appear on the Original Negative.

g.     **Paid Ad Credits and Billing Block**. One (1) electronic file of credit billings listing all cast, crew and production credits for the theatrical, television and video complete versions of the Picture to be given in paid advertising (including posters, print and outdoor ads) with the applicable contractual language relating to such billing, credit, advertising, name, likeness and other approvals, restrictions and requirements, together with a layout of the advertising copy in the form of a billing block with all contractual logos in their contractual positions.

h.     **Dubbing, Subtitling and Editing Restrictions**.  One (1) electronic file specifying all of the following restrictions, if any:

- All dubbing and subtitling restrictions relating to the replacement of any artist's voice. Any other restrictions relating to dubbing or subtitling, including the dubbing of dialogue in a language other than that in which the Picture was originally recorded.

- All contractual rights granted to any party to supervise or otherwise participate in the foreign dubbing and translations of the Picture, the video formatting, editing for television or other post-production or editing processes.
- If none, then a signed statement to that effect.

**i.**    **Clearances:** Delivery of a copy of all authorizations, licenses, contracts, agreements, releases, correspondence, logs, etc. relating to the clearance for use of (but not limited to) personal property, books, placement of any product, copyrights, brand names, logos, trademarks, art work, photographs, mastheads, stock footage, film clips (including actor reuse, WGA, DGA notifications and payments). If none, then a signed statement to that effect. Producer shall concurrently provide a list of all stock footage used in the Picture against which the rights granted, term of license and media to which rights apply.

**j.**    **Residual Materials**.  One (1) copy of each of the following materials:

- Final cast list as prepared by Producer's payroll company from which all residuals are to be calculated.
- IATSE pro-rata sheet, if applicable.
- Statement of Guild Obligations.  A signed statement setting forth any and all guilds which may be applicable to the Picture (i.e., SAG, WGA, DGA, IATSE, AFofM, AFTRA, ACTRA, DGC [Director's Guild of Canada], etc.). If none, then a signed statement to that effect.

**k.**    **Guild Approvals.**

- **Directors Guild Credit Approval**.  If the Picture is produced under the jurisdiction of the Directors Guild of America ("DGA"), a letter from the DGA approving the list of screen credits for the Picture submitted to the DGA pursuant to Article 8-201 of the DGA Basic Agreement.
- **Writers Guild Credit Verification**.  If the Picture is produced under the jurisdiction of the Writers Guild of America ("WGA"), a copy of the Notice of Tentative Writing Credits submitted to the WGA and, if the writing credits were submitted to a WGA credit arbitration, a copy of a letter from the WGA setting forth the final writing credits as determined by the WGA Credits Committee.
- **Production Designer Credit Waiver**.  If the Picture is produced under the jurisdiction of the Society of Motion Picture and Television Art Directors Local 876 ("Art Directors Guild") and Producer desires to accord credit to the art director in the form "Production Designer", a copy of a written waiver from the Art Directors Guild approving the use of such "Production Designer" credit.

**l.**    **Music Cue Sheet – Feature & Trailer**

- **Feature:**  One (1) electronic file of the music cue sheet detailing the particulars of all music contained in the final version of the Picture and Trailer, including the title of each composition; the usages and the number of such uses; the place of each composition showing the film footage and running time of each cue; the performing rights society involved for each composer and publisher; the percentage of ownership for each composer and publisher; and, any other information customarily set forth in music cue sheets.

- **Trailer:** One (1) electronic file of the music cue sheet detailing the particulars of all music contained in the final version of the Picture and Trailer, including the title of each composition; the usages and the number of such uses; the place of each composition showing the film footage and running time of each cue; the performing rights society involved for each composer and publisher; the percentage of ownership for each composer and publisher; and, any other information customarily set forth in music cue sheets.

    **m.**    **Music License Materials**. One (1) fully executed copy of each music synchronization, master use and performance license covering each musical composition embodied in each version of the Picture and corresponding evidence of payment for each license. Where any music performance license is claimed to be available by blanket license from a performing rights society, Producer may, in lieu of an individual license, provide copies certified by Producer to be complete and accurate in all material respects, of the composer, lyricist, and publisher affiliation agreements with the applicable performing rights society and the inclusion of the subject musical composition in the performing rights society's catalogue. The required terms for any music license is worldwide for all media in perpetuity for use in- and out-of-context of the Picture. Any reduced license must be subject to Cinema Management Group's prior written approval.

    **n.**    **Summary of Music Rights and Options**. A list of all the songs used in the Picture against which the rights granted, term of license, media to which rights apply, details of the options for extending or exercising certain rights or terms, shortfalls in the rights granted, etc. should be shown.

    **o.**    **Final Cast and Crew List**. One (1) electronic file of a list indicating: (i) the names, addresses and telephone numbers of each cast member (including the character they portrayed); and, (ii) the names, addresses and telephone numbers of all technical personnel (including their title or assignment) involved in the production of the Picture.

    **p.**    **Service Agreements**. One (1) fully executed copy of all agreements or other documents related to the engagement of all personnel and facilities in connection with the Picture, including those for individual producer(s), the director, editor, casting director, director of photography, unit production manager, 1st and 2nd assistant directors, AFofM members, all artists other than crowd artists, music composer and conductor, technicians and administrative staff. One (1) typewritten statement setting forth any and all nudity restrictions with respect to any actor's services with the applicable contractual language relating to any such nudity restrictions.

    **q.**    **Rating Certificate**. A fully paid certificate by the Code and Rating Administration of the MPAA granting the Picture the rating required under the Agreement.

    **r.**    **TV Version Records and Documentation**. One (1) typewritten copy of a statement setting forth in specific detail all cover shots taken for the TV version of the Picture, including all dialogue changes and film cuts.

    **s.**    **Chain of Title Documents**. Producer shall deliver the following documents to Cinema Management Group:

- **Chain of Title Affidavit.** A signed summary page outlining all Chain of Title documents, in chronological order.

- **Contracts.** One (1) fully executed copy of any and all documents, instruments and contracts pertaining to the acquisition of all underlying materials, including all literary and/or screenplay material, upon which the Picture is based, including but not limited to, assignments, licenses, consents and releases pertaining to all works of authorship and rights under copyright, trademark and other property or third party rights purchased and/or licensed by Producer which evidences Producer's chain of ownership in and to the rights granted Cinema Management Group in connection with the Picture. Documents evidencing proof of payment in connection with any transfer of rights shall be required. With respect to any non-English documents, a certified copy of the English translation thereof will be concurrently delivered to Cinema Management Group.

- **Copyright Certificates.** One (1) fully executed copy of a Form PA copyright registration certificate(s) and any renewal certificate(s) for the Picture and the Underlying Material plus evidence of filing with the U.S. Copyright Office for recordation (i.e., a copy of the cover letter and payment of the filing fee or a copy of the recorded Form PA as registered with the U.S. Copyright Office), or the applications for such registration(s).

- **Copyright and Title Opinions and Reports .** One (1) copy of a Copyright Opinion and Report and one (1) copy of a Title Opinion and Report issued  within three (3) months before Complete Delivery by a service known within the entertainment industry to provide such services.

    **t.**    **Other Documentation.** Physical Delivery of fully executed original copies of each of the following documents:

- **Copyright Mortgage and Assignment.** If required by Cinema Management Group, two (2) fully executed original copies executed by a duly authorized principal or officer of Producer in the presence of a Notary Public.

- **Final Certified Cost Statement.** One (1) fully executed original copy certified by Producer's Chief Financial Officer as being a true, correct and complete accounting of the final negative cost of the Picture.

- **Certificate of Origin:** Fifteen (15) Original Certificates of Origin, signed and notarized, certifying that the Picture was produced in the country of origin and that Cinema Management Group Pictures, LLC controls the exclusive rights in the foreign territory.

- **Assignment of Anti-Piracy Rights.** One (1) fully executed original copy of the Assignment of Anti-Piracy Rights in the form attached to the Agreement (or if not attached to the Agreement, to be provided by Cinema Management Group upon request).

    **u.**    **Insurance Certificates And Endorsements**:  Producer must make physical Delivery of separate original Certificates of Insurance and Endorsements evidencing Producer's Errors and Omissions coverage reflecting no material exclusions and in a form and substance satisfactory to Cinema Management Group reflecting inclusion the following language:

    1.    **Insureds.** Each of the following must be named as additional insured on separate original Certificates of Insurance: Sales Agent and any direct or indirect parent,

subsidiary and affiliate, and the successors, licensees, assigns and customers of each of them, and the officers, directors, agents, attorneys and employees of each of them.

2.    **Coverage**:  Errors and omissions insurance requirements: (i) limits of coverage not less than US$3,000,000 for each claim and US5,000,000 aggregate for all claims; (ii) a policy deductible no greater than US$25,000; (iii) a policy term expiring not earlier than three (3) years from the Complete Delivery of the Picture; and (iv) inclusion of all media, title and music coverage.

3.    **Endorsements**.  Each Certificates of Insurance must be accompanied by separate original Endorsement reflecting inclusion of all of the following language:

- During the term of Producer's coverage, Producer's coverage will be primary and any insurance coverage provided by the named additional insured will apply solely to the benefit of the named additional insured as excess insurance over and above Producer's coverage.

- Producer's insurance may not be modified, revised or canceled without separate thirty (30) days prior notice to each named additional insured at their addresses indicated above.

- With respect only to Distributor's Endorsement, the following additional language must be reflected:  The insurance carrier will at no additional cost name any other person(s) as additional insured and issue to such person(s) a separate original Certificate of Insurance and separate original Endorsement evidencing Producer's Errors and Omissions coverage upon the request and designation of Cinema Management Group at any time during the policy term.

Each separate original Certificate of Insurance and separate original Endorsement thereto will be delivered to Cinema Management Group on the date Producer obtains the policy, but, with respect to any Picture which has not commenced production as of the date of the Agreement, in no event later than commencement of principal photography or the date any such policy or binder of coverage or endorsement is provided to the production lender.  Cinema Management Group will be responsible to deliver such original documents to each additional insured.

| | ASK/TAKE SCHEDULE | | | | |
|---|---|---|---|---|---|
| *Charlie The Wonderdog* (meeting all Picture Specifications) | Rights Avail. | Ask (US$) | Take (US&) | Sold (US$) | Distributor |
| United States | All | 3,500,000 | 1,650,000 | | |
| Canada | NA | NA | NA | | |
| United Kingdom | All | 600,000 | 400,000 | | |
| France | sold | sold | sold | 275,000 | Le Pacte |
| Germany/Austria | All | 450,000 | 250,000 | | |
| Italy | All | 400,000 | 200,000 | | |
| Spain | sold | sold | sold | 90,000 | Flins & Piniculas |
| Benelux | sold | sold | sold | 65,000 | WW Entertainment |
| Scandinavia | All | 150,000 | 75,000 | | |
| Switzerland | All | 50,000 | 25,000 | | |
| Greece | sold | sold | sold | 30,000 | The Film Group |
| Portugal | sold | sold | sold | 35,000 | Films4You |
| Turkey | sold | sold | sold | 35,000 | BG Film |
| | | | | | |
| CIS | sold | sold | sold | 650,000 | VLG |
| Poland | sold | sold | sold | 200,000 | Kino Swiat |
| Czech/Slovak Rep. | sold | sold | sold | 30,000 | Bohemia |
| Hungary | All | 25,000 | 12,500 | | |
| Romania | sold | sold | sold | 15,000 | Karpat Media |
| Bulgaria | All | 20,000 | 10,000 | | |
| X-Yugoslavia | sold | sold | sold | 10,500 | Blitz |
| | | | | | |
| Israel | sold | sold | sold | 37,500 | Filmhouse |
| Middle East | sold | sold | sold | 110,000 | Front Row |
| | | | | | |
| Japan | All | 200,000 | 120,000 | | |
| S.Korea | All | 300,000 | 175,000 | | |
| China | All | 450,000 | 200,000 | | |
| Taiwan | sold | sold | sold | 25,000 | Wanin Intl |
| Thailand | All | 50,000 | 25,000 | | |
| Hong Kong | All | 45,000 | 20,000 | | |
| Singapore | All | 50,000 | 20,000 | | |
| Malaysia | All | 40,000 | 20,000 | | |
| Philippines | All | 45,000 | 20,000 | | |
| Indonesia | All | 30,000 | 12,500 | | |
| India | All | 30,000 | 15,000 | | |
| Mongolia | All | 20,000 | 10,000 | | |
| Vietnam, Laos, Cambodia, Myanma | sold | sold | sold | 35,000 | Mockingbird Pictures |
| | | | | | |
| Brazil | All | 150,000 | 60,000 | | |
| Mexico | All | 150,000 | 60,000 | | |
| Argentina, Uruguay, Paraguay, Chile | All | 30,000 | 20,000 | | |
| Bolivia, Peru, Ecuador | All | 35,000 | 25,000 | | |
| Colombia | All | 25,000 | 15,000 | | |
| Central America | All | 20,000 | 15,000 | | |

| | | | | | |
|---|---|---|---|---|---|
| Pan Latin American Pay TV | All | 150,000 | 100,000 | | |
| Latin America - All Rights | All | 550,000 | 250,000 | | |
| | | | | | |
| Australia/New Zealand | All | 175,000 | 85,000 | | |
| South Africa | All | 125,000 | 65,000 | | |
| Airlines | All | 200,000 | 85,000 | | |
| | | | | | |
| **Total** | | **7,505,000** | **3,745,000** | **1,643,000** | |

*Property of Cinema Management Group, LLC – Strictly Confidential.  These figures are estimates only for internal use and should not be construed as or presented as anything else.*

**SCHEDULE "A' TO LAB ACCESS LETTER**

**EXHIBIT 1**

# LAB ACCESS LETTER

Date: *Sept 30th 2023*

Laboratory: *ICON CREATIVE STUDIO INC.*
*#200 - 341 Water Street*
*Vancouver, BC Canada*
*V6B1B8*

**Re:** *Charlie The Wonderdog* ("Picture")

Gentlemen:

This will advise you that the undersigned ("Licensor") has authorized Cinema Management Group, LLA, and its designees ("Licensee") to access to the feature film elements listed on the attached Schedule A.

You represent and warrant that there is on deposit in your laboratory Picture Materials of such condition as to permit the manufacture of commercially acceptable pre-print materials and release prints.

We authorize, direct and instruct you, and you agree, to fill all orders from Licensee at Licensee's cost and expense for positive prints and any other laboratory services and materials with respect to the Picture as Licensee from time to time may order, subject to Licensee's ability to meet its obligation at the laboratory. You agree to deliver to Licensee, upon their request, materials as they may order.

You shall not permit the Picture Materials of the Picture to be removed from your possession without the express written consent of the Licensor and Licensee.

All materials and services which you may supply to, or order of, Licensee is to be paid for solely by Licensee. You agree that Licensor shall not be liable to pay any of your charges which may be incurred by Licensee for any services or materials relating to the Picture, and that you will neither refuse to process Licensor's orders for materials and services relating to the Picture nor assert any lien on the Picture or any material relating thereto as against Licensor by reason of failure of Licensee to pay charges which it may incur for materials or services relating to the Picture.

You agree that Licensee shall not be liable to pay any of your charges which may be incurred by Licensor or any of Licensor's other licensees for any services and materials relating to the Picture and that you will neither refuse to process Licensee's order for materials and services relating to the Picture nor assert any lien against the Picture or any materials relating thereto as against Licensee by reason of the failure of Licensor or any of Licensor's other licensees to pay any charges which they may incur for services and materials relating to the Picture, except that the Laboratory shall comply with all Federal, State and local statutes.

2:24-bk-20369-NB   Doc 9   Filed 01/17/25   Entered 01/17/25 17:15:50   Desc
Main Document      Page 78 of 81

The authorization herein set forth may be modified or revoked only by written notice to you signed by Licensor and Licensee.

Please indicate your agreement to the foregoing by signing in the space provided below.

Very truly yours,

(LICENSOR)

By: _Wonderdog 1 Productions Inc._

Its: _SHEA WAGEMAN_
        _PRESIDENT / CEO_

(LABORATORY)

        _ICON CREATIVE STUDIO INC._

By: _SHEA WAGEMAN_

Its: _PRESIDENT / CEO_

(LICENSEE)

By: _____

Its: _____

Access Letter
[!Picture!]

V: 2016
2

## MORTGAGE OF COPYRIGHT AND SECURITY INTEREST

| | |
|---|---|
| **Mortgagor:** | Wonderdog 1 Productions Inc. |
| **Secured Party:** | Cinema Management Group, LLC |
| **Work:** | *Charlie The Wonderdog* |
| **Effective Date:** | As of September 30, 2023 |

*M*ortgagor, for good and valuable consideration, receipt of which is acknowledged, exclusively creates, grants, conveys, collaterally assigns and mortgages to Secured Party a continuing security interest in and to the Collateral described on the attached Description of Collateral with regard to the "Picture" described below in order to secure the Secured Obligations as defined in and subject to the terms and conditions of that certain Sales Agency Agreement ("Agreement") made between the parties dated as of the same effective date as this Mortgage of Copyright.

The "Picture" means the original motion picture entitled *Charlie The Wonderdog* and all of its elements, including its title and the screenplay on which it was based, in all stages of production. The screenplay was registered under the title 'Charlie the Wonderdog – White Draft 09/19/24' in the United States Copyright Office on Sept 19th showing Wonderdog 1 Productions Inc. / Shea Wageman as authors and Wonderdog 1 Productions Inc. as copyright claimant under a written agreement and given U.S. Copyright Office Registration Number PAu 4-237-574. The motion picture based on the screenplay was registered under the title *Charlie The Wonderdog* in the United States Copyright Office on ⟨TBD⟩ showing Wonderdog 1 Productions Inc. as author of a work-made-for-hire and copyright claimant and given U.S. Copyright Office Registration Number ⟨TBD⟩.

This Mortgage of Copyright and the Agreement will be interpreted together to form one instrument, *provided that,* in case of any conflict, the terms of this document will control. This document will be governed by and interpreted under the laws of the State of California and controlling copyright laws of the United States of America.

*In Witness Whereof,* Mortgagor has executed this instrument to be effective, conclusive and binding as of the Effective Date set forth above.

**Mortgagor**
**Wonderdog 1 Productions Inc.**

By: _____
        Shea Wageman
Its: Manager

## Description of Collateral

The "Collateral" means any and all of the following with respect to that certain Sales Agency Agreement made as of Effective Date above between Wonderdog 1 Productions Inc. ("Debtor") and Cinema Management Group, LLC ("Secured Party") regarding the motion picture, and all of its elements including its title and screenplay, currently entitled *Charlie The Wonderdog* (the "Picture").

(a)    *General Intangibles, Accounts, Payment Intangibles and Claims*: All of Debtor's right, title and interest: (i) under copyright, trademark, patent or other intellectual property rights in the Rights in the Picture throughout the Territory for the Term under the Sales Agency Agreement; (ii) all agreements and understandings necessary or convenient to the exercise of such right, title or interest, including those with persons rendering services or materials in connection with the Picture; (iii) all of Debtor's rights to receive any payment under the Sales Agency Agreement to the extent of Secured Party's Commission and Recoupable Expenses, including all related payment intangibles and accounts; (iv) all rights under any Distribution Agreement or other license agreement substantially negotiated or concluded made by Secured Party under the Sales Agency Agreement, including all rights to payment, royalties, accounts, payment intangibles, general intangibles or claims arising under them; and (v) all rights to any payments under any infringement or piracy action, arbitration or proceeding with respect to any Rights in the Picture throughout the Territory for the Term.

(b)    *Goods and Tangible Property*: All of Debtor's right, title and interest in and to: (i) all goods, equipment and physical materials Delivered to Secured Party under the Sales Agency Agreement, including film, sound and video elements, and all documents, advertising, publicity and servicing materials; and (ii) all goods, equipment and physical materials created or manufactured by Secured Party in accordance with the Sales Agency Agreement, including field elements, masters, ad/pub and servicing materials.

(c)    *Proceeds*: All proceeds, whether in cash, check, draft, note, compromise of rights agreement, or other tangible or intangible property realized by Debtor directly or indirectly from any sale, lease, license, transfer, disposition or exploitation of any of the above.

(d)    *Definitions*: For ease of reference, under the Sales Agency Agreement: "Rights" means all Distribution and Allied Rights as defined in the Sales Agency Agreement. "Distribution Rights" means all exclusive rights in the Picture in all distribution media as defined in the IFTA® International Schedule of Definitions: Cinematic, Ancillary, PayPerView, Video, Pay TV, Free TV, VOD, EST TV and Souvenir Booklets in Asia. "Territory" means "Worldwide *excluding* Canada and its respective territories, possessions and protectorates." The "Term" means the Agency Period starting on the Effective Date and continuing until twenty (20) years after Complete Delivery of the Picture to Sales Agent as well as any allowed Distribution Term under any distribution agreement.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Barnes & Thornburg, LLP, 2029 Century Park East, Suite 300, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (PERSONAL PROPERTY)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 1-17-2025      , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

• Jerome S Cohen    jsc@jscbklaw.com
• Paul J Laurin    plaurin@btlaw.com, slmoore@btlaw.com; jboustani@btlaw.com;
• John D Monte    johnmontelaw@gmail.com, monte.johnb117807@notify.bestcase.com
• John P Pringle (TR)    brenfro@rpmlaw.com, jpp@trustesolutions.net;jpringle@rpmlaw.com
• United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov ☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 1-17-2025    , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Neil W. Bason
United States Bankruptcy Court - Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1552 / Courtroom 1545
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 1-17-2025 | Stephanie L. Moore | /s/ Stephanie L. Moore |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014    Page 12    **F 4001-1.RFS.PP.MOTION**